**MATTERN HATCHERY, INC.,**
et ux., Plaintiffs,

v.

**BAYSIDE ENTERPRISES,**
**INC., Defendant.**

**No. CV–90–0403.**

United States District Court,
M.D. Pennsylvania.

Aug. 29, 1991.

Ronald M. Katzman, Gerard M. Mackarevich, Goldberg, Katzman & Shipman, P.C., Harrisburg, Pa., for plaintiffs.

Charles W. Rubendall, II, Keefer, Wood, Allen and Rahal, Harrisburg, Pa., Rufus E. Brown, Drummond, Woodsum, Plimpton & Machahon, Portland, Me., for defendant.

## MEMORANDUM

McCLURE, District Judge.

## I. BACKGROUND

Plaintiffs Mattern Hatchery, Inc. ("Mattern") and Empire Kosher Poultry, Inc.

("Empire")[1] allege in this diversity action[2] that Bayside Enterprises, Inc. ("Bayside") breached express and implied warranties and fraudulently misrepresented the genetic history and quality of a breed of poultry known as the Penobscot which Bayside sold to Empire in July, 1988.

Empire is the world's largest kosher processors of chicken. Prior to 1988 when it sold the breed to Empire, Bayside ran a breeding operation (centered in Belfast, Maine) and a processing operation. For nearly twenty years, it sold eggs and birds to Empire, and was Empire's sole supplier of the Penobscot breed, which, unlike most other commercial breeds, is well-suited to Kosher processing techniques.[3] (Swanger deposition, pp. 15–17 and 50; Katz deposition, pp. 13 and 35)

In approximately 1987, Bernie Lewis, the president and principal shareholder of Bayside began to consider selling the Bayside operation, principally because at that time he was in failing health. When he was unsuccessful in locating a buyer for the entire operation, he approached Murray Katz, the president and principal shareholder of Empire, with an offer to sell the breed alone. Initially, his offer met with rejection, but after giving the matter further consideration, Katz decided to purchase the Penobscot breed and related assets from Empire. This decision was made in August of 1987, when Katz instructed his staff to "make it happen". (Katz deposition, pp. 37–38; 48–50, 57 and 59) Lewis

and Katz negotiated a sale price of $1.2 million, $800,000 less than Lewis' initial asking price.

After many months of discussions and exchanges of information between the staffs of the two companies, the sale was finally completed on July 7, 1988. Not long thereafter, Empire experienced troubling difficulties with the breed. It noticed a dramatic decline in the final weight of the roasters, a serious problem because even a seemingly small decline in average weight per bird translates into a considerable sales loss. Empire calculates its total losses at $1 million.[4]

This was not, however, its first inkling that there was some difficulty with the breed in this respect. As early as 1985, Empire had noted a distinct and very discernible trend of declining broiler weights. It alleges, however, that the post-sale decline was far more precipitous and serious.

Empire contends that the decline in broiler weights is due exclusively to genetic mismanagement of the breed by Bayside prior to the sale. The deplorable conditions of Bayside's genetic selection procedures was kept from Empire until after the sale. Empire contends that, although it was aware prior to the sale that Bayside's genetic program was lacking in some respects, it was wholly unaware of the degree of the decline and the seriousness of the problem until it gained access to genet-

1. Mattern is a wholly owned subsidiary of Empire, and so we will refer to them collectively as Empire.

2. Jurisdiction exists pursuant to 28 U.S.C. § 1332. Plaintiffs filed this action on February 28, 1990. On March 22, 1990, Bayside filed a declaratory judgment action in state court in Maine. Empire removed the action to the United States District Court for Maine, which subsequently transferred Bayside's action to this court, where it was consolidated with the action previously filed by Empire.

3. Katz thought that Empire had no choice but to buy the breed if no other offers materialized, because Empire should not risk losing the breed. (Soccio deposition, pp. 133–35; and Swanger deposition, p. 50) Empire's Chief Financial Officer, Matthew Soccio explained in depositions that if Empire had decided not to

buy the breed, it probably would have become extinct, and without the Penobscot, Empire would have been compelled either to purchase other breeds not ideally suited to the cold water defeathering process or to attempt to develop its own breed, which would have taken several years. (Soccio deposition, pp. 134–35)

4. Empire describes its losses as follows:

Empire contends that this underperformance resulted in broilers coming through the processing plan from May to October, 1989, at an average weight that was .17 of a pound lighter than normal. This lost weight per bird, multiplied by millions of chickens that were processed during the May–October, 1989 period, resulted in over $1,000,000 worth of poundage that did not go to market.

(Record Document No. 55, filed May 10, 1991, pp. 10–11, citing Swanger deposition exhibit "5")

ic selection records and other information after the sale. Empire further contends that Bayside took steps to conceal this information from it and to reassure it that all was well with the program prior to the sale.

Empire also alleges that Bayside breached an implied oral contract pre-dating the sale of the breed. (Plaintiffs' complaint, Count V). It contends that during the period when Bayside was acting as its supplier, Bayside had an implied obligation to supply birds which would gain sufficient weight to assure profitability.

Bayside asserts a counterclaim for the balance of the promissory note which Empire executed to secure payment of the remainder of the purchase price. Empire stopped paying on the note, not long after it began voicing complaints about the quality of the breed. Under the terms of the note, Bayside now seeks to recover the balance due, plus counsel fees.

Trial is scheduled for September, 1991. Before the court are: (1) a motion (Record Document No. 48, filed April 1, 1991) for summary judgment filed by Bayside; (2) a motion (Record Document No. 50, filed April 19, 1991) to compel filed by Bayside; and (3) a motion (Record Document No. 71, filed June 7, 1991) by plaintiffs for leave to file an additional brief in opposition to Bayside's summary judgment motion.

For the reasons discussed below, the court will enter an order: (1) granting Bayside's summary judgment motion; (2) denying Bayside's motion to compel as moot, and (3) denying plaintiffs' motion for leave to file an additional brief.

## II. DISCUSSION

### Summary judgment standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c)

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, an on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra,* 477 U.S. at 323 and 325, 106 S.Ct. at 2552 and 2553.

Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3rd Cir.1988), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson, supra,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3rd Cir.1988).

### Breach of warranty claim

Empire alleges breach of warranty under the sale contract in two respects. It con-

tends that underperformance of the breed post-July 1988 breaches an implied warranty of fitness for a particular purpose read into the contract under the Uniform Commercial Code ("UCC").[5] It also contends that the decline is linked to Bayside's breach of an express warranty that to the best of its knowledge, "the [Penobscot] lines are and have been maintained in pure form."

■ Bayside urges dismissal of both claims. Clearly, the implied warranty claim cannot stand. The contract[6] specifically provided that the breed was being sold *"as is, where is, with no warranties whatsoever,* except those expressly set forth in the letter of intent" (emphasis added) and that Empire is responsible for veri-

fying to its own satisfaction the quality and condition of the breeding stock at the time of sale. (Swanger deposition, pp. 191 and 209; Katz deposition, pp. 77–78)

Under the UCC,[7] parties to a contract may negate the existence of implied warranties by stating in a way likely to capture the buyer's attention, as was done here, that the goods are sold "as is" or "with all faults", terms which are commonly understood in a commercial setting to mean that all risk of non-compliance is on the buyer, not the seller. M.R.S.A. § 2–316(3)(a) and (b)[8] and Comment 7.[9]

We find no basis for overriding the parties' clearly expressed negation of implied warranties.[10] Empire has no basis for introducing parol evidence in an effort to contravene the plain meaning of the par-

5. Under the Uniform Commercial Code:
   Where the seller at the time of contracting has reason to know:
   (1) any particular purpose for which the goods are required; and
   (2) that the buyer is relying in the skill or judgment of the seller to select or furnish suitable goods;
   there is unless·excluded or modified under section 2316 (relating to exclusion or modification of warranties) an implied warranty that the gods shall be fit for such purpose.
   M.R.S.A. § 2–315.

6. The sale contract consisted of two documents, a letter of intent and a bill of sale, both executed July 7, 1988, the date of closing.

7. Both sides concede application of the UCC. The breed is clearly goods within the meaning of sections 2–102 and 2–105.

8. Code section 2–316 provides:
   (1) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like '*as is,*' 'with all faults' or other language which in common understanding calls the attention of the buyer to the exclusion of warranties and makes plain that there is no implied warranty. (emphasis added)
   (2) When the buyer before entering into the contract has examined the goods ... as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him.

9. We cite Maine statutory law, because it is clear that Maine law governs. Under *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), we are required to apply Pennsylvania choice of

law rules. Both sides contend, and we agree, that the contract and the allegations surrounding it are governed by Maine law. Maine has more significant contacts with the transaction than any other state. Bayside is centered in Maine, and its breeding operation was located there as well. Most of the conduct at issue, e.g. inspections by Empire of the breed, representations made by Bayside, took place in Maine. See: *Griffith v. United Air Lines,* 416 Pa. 1, 203 A.2d 796 (1964).
   Additionally, the contract provides that Maine law governs.

10. Empire not only signed the agreement after consulting with counsel, it was advised by counsel not to sign it because of the absence of warranties. (Soccio deposition, pp. 135–38)
   Soccio testified:
   Q. And he [counsel] warned you that if you didn't have the warranties in there, you would have no protection later on?
   A. He advised us, yes.
   ....
   Q. Who else was there when he advised you?
   A. Well, I think Murray was there, Ronny was there, Phil Tabasso was there.
   ....
   Q. ... [A]fter Mr. Katzman warned you that if you didn't have the warranties in the contract then there wouldn't be any protection later on, was there any further discussion among you and Ron and Murray and Phil Tabasso?
   A. We left that decision up to Murray ... Bernie Lewis assured us that things would be all right. Don't worry, Murray. You know, that type of assurance. So Murray went along with Bernie's wishes of not putting it in.
   Soccio deposition, pp. 137–38. See also: Swanger deposition, p. 191.

ties' integrated contract.[11] *Astor v. Boulos Co.*, 451 A.2d 903, 905 (Me.1982).

■ Bayside's attempt to recover for breach of the express warranty fails for a different reason. All of the damages Empire seeks to recover constitute lost revenues, and the contract specifically disclaims liability on the part of Bayside for "any incidental or consequential damages for any cause whatsoever" incurred in connection with sale of the breed.[12]

Empire has not come forward with any evidence which overrides or negates this, and so its stands as a bar against recovery of the lost revenues Empire seeks.

■ A further difficulty with Empire's reliance on this warranty, the only warranty given, is that its claim does not go to the purity of the line. In the poultry industry, "purity" of a line means that the population, i.e. the line, has been closed to outside bloodlines for several years. Both sides agree on this definition. They disagree, however, on the inferences which flow from it. Empire argues that impurity of the line caused the problems it is now suing over, and Bayside contends that purity of the line has nothing to do with the problems alleged. This difference of opinion is of no consequence, because Empire has admitted on the record that the lines were pure at the time of sale. This admission ends the inquiry, because it is a de facto concession that it received what it bargained for, a pure line.

The admission was stated in an internal memo from Empire's geneticist, Dr. Katanbaf, to J. Ronald Swanger, the individual whom Murray Katz placed in charge of the acquisition. Dr. Katanbaf told Swanger that he was mistaken in asserting that the Penobscot lines were not pure at the time of the sale. Dr. Katanbaf wrote: "[T]hat [purity of the line] holds for the Penobscot lines when Empire purchased the program and still holds." (Swanger exhibits 2 and 3 and 101) This information was conveyed at a time when Swanger was drafting a letter to Bayside outlining its claims based on the alleged unsuitability of the breed. Two versions of the letter were drafted, and a statement that the line was not pure is deleted from the second, which is dated January 25, 1989. (Record Document No. 49, filed April 15, 1991, exhibits 2 and 3)

Empire has presented nothing to countermand this early, telling admission, other than its irrelevant assertions that "purity" is subject to differing interpretations and that the purity of a line impacts on its weight performance. The latter is of no relevance, if the lines were pure at the time of sale, under a definition of "purity" which both sides understood to be the same, as apparently was the case. In depositions, both Swanger and Katanbaf have stood by their initial statement that the line was pure at the time of sale. (Swanger deposition, p. 380; Katanbaf deposition, p. 339) (Plaintiffs' amended complaint, paras. 10, 23 and 24)[13]

11. The contract's integration clause provides: This Agreement ... and the documents delivered pursuant hereto, constitutes the entire agreement between the parties. No changes or modifications of, or additions to this Agreement, shall be valid unless the same shall be in writing and signed by all parties hereto.

12. Of the $1.2 million purchase price, $200,000 was allocated to the sale of the actual breeding stock (i.e. the pedigrees, the multipliers (GGPs) and the primaries (Gps) in Maine and other related assets; $1 million was allocated to the purchase of the breed. Empire paid $200,000 on the date of closing, and executed a promissory note in favor of Bayside for the balance of $1 million.

13. Dr. Barbato testified along the same lines: Q. I just wanted to focus on the word pure lines.... And then I want to show you an exhibit ... a letter of Manochehr ... Swanger Exhibit 101.
In this exhibit, Manochehr is writing to Ron Swanger ... I want you to understand in connection with this letter which was written to Bayside what purity means from the point of view of a geneticist. Then he writes, " 'Purity' by definition means that the population (line) has been closed to outside blood for several years. And that holds for the Penobscot lines when Empire purchased the program and still holds."
....
Q. I want to ask you as a geneticist, would you agree with Manochehr's statement of what purity means?
A. I think that that's a fair assessment of a pure line.
Q. So a pure line is a closed line, is that right?

*Fraud claim*

■ Empire alleges that Bayside fraudulently concealed material facts about the precipitous decline of the breed within the two years prior to the sale. (Plaintiffs' complaint, Count III). Common law fraud claims are not displaced by the UCC [14] or by the seller's disclaimer of warranties. See generally: *St. Croix Printing v. Rockwell International Corp.*, 428 N.W.2d 877, 881 (Minn.App.1988), citing *Prosser & Keeton, The Law of Torts,* section 109, p. 764 (5th ed. 1984).

■ To avoid summary judgment on a fraud claim, the plaintiff must establish by clear and convincing evidence a prima facie case for each of the five elements necessary to prove fraud at trial. *Anderson, supra,* 477 U.S. at 254, 106 S.Ct. at 2513. The five elements necessary to prove fraud are:

(1) A false representation;

(2) of a material fact;

(3) made with knowledge of its falsity, or in reckless disregard for the truth;

(4) for the purpose of inducing reliance; and

(5) justifiable reliance by the plaintiff to his detriment.

*Butler v. Poulin,* 500 A.2d 257, 260 (Me. 1985); *Wildes v. Ocean National Bank of Kennebunk,* 498 A.2d 601, 602 (Me.1985) and *Letellier v. Small,* 400 A.2d 371, 376 (Me.1979). To satisfy the "clear and convincing" evidence requirement, the plaintiff must "place in the fact finder an abiding conviction that the truth of the factual contentions are highly probable." *Taylor v. Commissioner of Mental Health and*

*Mental Retardation,* 481 A.2d 139, 153 (Me.1984).

■ A principal is liable for the fraudulent misrepresentations made by its agent acting within the scope of his authority, whether or not the principal knew of the agent's misconduct. *Arbour v. Hazleton,* 534 A.2d 1303, 1306 (Me.1987), citing, *inter alia, Restatement (Second) of Agency,* § 257 (1958).[15]

■ Under Maine law, the failure to disclose a fact, even a material fact, is not actionable fraud, absent the existence of a confidential relationship between the contracting parties or statements calculated to mislead the buyer. *Eaton v. Sontag,* 387 A.2d 33, 38 (Me.1978). This is the case even if seller is aware of, but fails to disclose, a substantial defect in the goods. *Stevens v. Bouchard,* 532 A.2d 1028, 1030 (Me.1987). (In the context of a real estate transaction, the court held that no duty "to disclose defects in the premises exists and the doctrine of caveat emptor applies ...")

■ We find as a matter of law that the "confidential relationship" exception does not apply. Although Empire urges us to find such a relationship based on the long-standing business relationship and that Katz trusted Lewis based on their prior dealings, that is not the sort of relationship which the law contemplates in this context. See, e.g., *Reid v. Key Bank of Southern Maine, Inc.,* 821 F.2d 9, 17 (1st Cir.1987) ("In Maine, 'a general allegation of a confidential relation is not a sufficient basis for the existence of one.' ") citing *Ruebsamen v. Maddocks,* 340 A.2d 31, 35 (Me.1975). "A good working relationship between two parties ... is not sufficient evidence for a

---

A. Yes, sir.
Q. As opposed to a hybrid line.
A. Yes.
Q. Which it's [sic] a cross?
A. Yes.
....
Q. And the pure line doesn't describe the genetic makeup except for its' closed or performance, is that correct?
A. That's correct, a pure line is just a closed breeding population that's been closed for really an indeterminate number of generations.
G. Barbato deposition, pp. 103–105.

**14.** Section 1–103 of the UCC states: Unless displaced by the particular provisions of this chapter ... the law relative to .. fraud, misrepresentation ... or other ... cause shall supplement its provisions. M.R.S.A. § 1–103.

**15.** Section 257 provides that:
A principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is: (a) authorized; (b) apparently authorized; or (c) within the power of the agent to make for the principal.

finding of the existence of the special legal obligations of a confidential relation." *Reid, supra,* 821 F.2d at 17. See also: *Webber Oil Company v. Murray,* 551 A.2d 1371, 1375 (Me.1988) (In the context of a franchisor/franchisee dispute, the court held that Maine "recognizes a fiduciary obligation only when 'the relations between two persons are such that one is completely dependent and relies upon and necessarily reposes confidence in the other.' ").

Empire points to four critical problem areas which it alleges were concealed from it prior to the sale: (1) the decrease in the level of selection pressure applied to female primary chicks [16] of lines 11 and 32; (2) the mix of experimental lines introduced into the breed during the two years prior to the sale (Record Document No. 55, filed May 10, 1991, p. 9) and plaintiffs' opposing brief. p. 49 (3) the lack of selection pressure on male primaries; (4) the decrease in population volume of great grandparent birds or "multipliers" and pedigrees.

■■■ Empire alleges that Bayside intentionally withheld records and selection information which would have revealed these deficiencies in the genetic program and also refused to allow its geneticist to participate in the selection procedures prior to the sale. (Record Document No. 55, filed May 10, 1991, p. 9). It contends that this was done to prevent Empire from discovering that its breeding operation had deteriorated considerably and to such an extent that it was predictable that Empire would experience problems with the breed in the future. (Record Document No. 55, filed May 10, 1991, p. 12, citing M. Katanbaf deposition, pp. 266–67).

The specific, affirmative acts which Empire alleges are: (1) housing grandparent breeders at the Steinhort Farm, a pedigree/great-grandparent facility. Empire alleges that this was done in an attempt to conceal "how dangerously low the pedigree and great grandparent populations had become." (Plaintiffs' opposing brief, p. 53); (2) sending data under circumstances which led Empire to assume that it pertained to primaries when it in fact pertained to pedigrees; (3) reassurances by Bernie Lewis as to the quality of the breed.

Empire's allegations of misleading data relate to information which Dick Koski enclosed with a letter he sent to Dr. Barbato [17] on June 14, 1988. (Swanger deposition exhibit 62) Koski enclosed data on pedigrees, information which Dr. Barbato had previously requested. Dr. Barbato mistakenly assumed that the enclosed data related to primaries, information which he had also previously requested. There was nothing in the letter itself to lead Dr. Barbato to believe that this was the case. It was purely an assumption on his part, as he has admitted in depositions.[18] Plainly, Koski cannot be found to have misrepresented data based on someone else's mistaken assumption. Further, Dr. Barbato has admitted that he found the data Koski supplied essentially useless and did not rely on it in making his determinations.[19]

---

**16.** Primaries are the grandparents (i.e. the third generation) of the commercial broilers which are processed and sold. The fourth generation is the great-grandparents of the commercial broilers, and the best of those birds are selected to become the pedigrees.

**17.** Guy Barbato, Ph.D. is a geneticist whom Bayside retained as a consultant during the sale negotiations.

**18.** Dr. Barbato testified:
A. .... I mean, I'm not saying the man is dishonest. All I'm saying is, I asked for grandparent sample weights. *He sent me lists of them, and that's what I thought they were. And he did not indicate in there that those were pedigree.*
Q. Any assumptions you make about misrepresentations or whatever has to be from the letter itself or based on your request. Is that right? There's no other communication you can remember?
A. I don't know how else to evaluate it.
Q. Now, you did ask for ... pedigree records. That was one of the things you asked for.
A. Yes, I did.
(G. Barbato deposition, pp. 179–80) Dr. Barbato did not contact anyone to clarify the source of the data, but proceeded on the basis of his assumption that it related to primaries.

**19.** Dr. Barbato testified:
Q. And did you draw any conclusions based on that interpretation about the breed?
A. Well, as a matter of fact, I find the entire document useless.
Q. And you found it useless at the time?

The same is true of Empire's allegations about the Steinhort Farm. Empire has pointed to nothing which suggests that the birds were housed at Steinhort in an effort to deceive it. Bayside's employees have uniformly testified that the birds were housed there due to lack of space at other facilities. Although Empire has questioned this, it has not come forward with any evidence to the contrary. Moreover, Bayside's employees have testified, again without contradiction, that the pens at Steinhort were plainly marked with labels indicating which birds they housed. If any Empire employee wanted to ascertain what was in a particular pen, all he or she had to do was check the marker. There is nothing to indicate intent to deceive on Bayside's part, and much to indicate no ill motive in housing the primaries at Steinhort.

Bayside readily admits that it housed primaries at the Steinhort Farm, and has stated why this was done. Bayside employees have consistently stated that the primaries were housed at Steinhort due to a lack of space at other facilities. (W. Corey deposition, pp. 69–70; R. Eldridge deposition, pp. 37–38 and 42; and Koski deposition, pp. 95–96) Moreover, they have testified, without contradiction, that the names of the birds housed in each cage were clearly marked on the outside of each pen, and if Empire employees had troubled to look at any of the name tags, they would have seen this information. A Bayside employee testified: "[A]nybody in the building can just look at a pen and know what lines are in it and what inventory is in it and what eggs are." (W. Corey deposition, pp. 69 and 88)

Moreover, Empire was aware prior to the sale that primaries were housed at Steinhort. In letters dated June 27, 1988 and July 1, 1988, which Dr. Katanbaf, who by that time had been acting supervisor of the Belfast breeding program for three weeks, complained to Swanger about the impropriety of housing primaries there.[20] (Swanger deposition exhibits 43 and 44; Katanbaf deposition, pp. 146–49 and 179 and Katz deposition, pp. 116–18)

Finally, although Lewis gave many reassurances to Empire staffers and management over the course of the lengthy negotiation period,[21] Empire has not pointed to a single statement which affirmatively represents that the breeding operation was free from the genetic errors/mismanagement which Empire now alleges have been the root of all of its subsequent difficulties with the breed. Lewis clearly made many general statements to Murray Katz, Ron Swanger, Dr. Barbato, Soccio[22] and others about the quality of the breed. On one occasion, when Dr. Barbato expressed concern to Swanger and Katz about Bayside's unwillingness or refusal to hand over certain records, they told him that Lewis had assured them "that it's okay and that everything has been done in the last 20 years the same way and that [sic] bird

A. I found it useless now, then, at every instance.
Q. So it's really immaterial what it says?
A. It doesn't matter.
(G. Barbato deposition, pp. 183–84)
Barbato shared these views with Swanger and Katzman. In a letter dated May 21, 1988 addressed to M. Katzman, Dr. Barbato complained:
... All of the information regarding breeding was garnered from conversations with D. Koski of the Bayside operation. He was relatively uncommunicative regarding these matters and even the printed data forwarded to us contained contradictory information and, hence, may require correction.
Swanger was copied in on the letter. (Record Document No. 49, filed April 15, 1991, Swanger deposition exhibit 29)

20. Swanger testified:

Q. So you would agree with me that as of July 1 you were aware that there were primaries housed in the Steinort [sic] building?
A. Yes.
Q. And that Manouchehr [Katanbaf] was aware of that earlier, at least by June 27th?
A. Yes.
Swanger deposition, p. 179.

21. Bernie Lewis died May 27, 1989, and we note in passing that the Deadman's Rule may prove a barrier to Empire's use of conversations its staff and managers allegedly had with Lewis prior to his death. This is a relevant consideration at this stage of the case, since plaintiffs can rely only on admissible evidence to ward off summary judgment.

22. Matthew Soccio was Empire's chief financial officer at the time.

we're getting is the same bird we've been getting.... That Empire was getting ... the same bird they had been getting for whatever years." (G. Barbato deposition, p. 125). Soccio also recalled Lewis giving assurances. Soccio echoed Barbato's recollection. He stated: "Bernie kept assuring us that what we were getting after the closing was the same thing we had been getting all through the years and as a layman in this, I assumed everything was proper."

■ The closest Lewis came to representing specifically that the genetic selection procedures Bayside was using were proper was a statement he made on a trip to visit Empire's Pennsylvania facility. Bayside alleges that Lewis stated that there was "nothing the matter with the genetics of the progeny of the line and there was no reason to be concerned." (Swanger deposition, p. 223. See also: Tabasso deposition, pp. 51–52).

Even if we construe this as an affirmative representation as to the genetic selection procedures, which we are not convinced it is, a further problem remains. Empire management, including Swanger,[23] and others,[24] placed little faith in Lewis' statements and felt that he was familiar with the breeding operation only in an overall way and did not have a firm grasp of what occurred at the operation day-to-day. (Swanger deposition, pp. 169–70, 223; and Katz deposition, p. 40) Having this attitude, they placed little faith or credence in the reassurances he gave, certainly did not rely on them, and have stated as much in internal communications.[25]

23. Swanger testified:

Q. As a result of that [assurance by Bernie Lewis], did you feel that your prior concerns and distrust for Koski were no longer warranted?
A. No.
Q. So you took that with a grain of salt?
A. Yes.
Q. What was your understanding of Bernie's knowledge of the details of the genetic program?
A. I do not believe that Bernie had a grasp on the primary breeding operation.
Q. He didn't know the details?
A. He didn't know the details of the primary breeding operation....
....
Q. ... [Y]ou didn't look to him [Lewis] for knowledge of the genetic dealings?
A. No, no.
Q. So if he made a statement to you to the effect that these birds were maintained in good genetic practices, chances are he didn't know what he was talking about in your mind?
A. In my mind, yes.
Swanger deposition, pp. 170–71.

24. Murray Katz testified:

Q. Well, did he [Bernie Lewis] mislead you about the management or husbandry in any way?
A. I think that Bernie Lewis presented something to us that in his heart, in his mind and in his soul was the way he said it was supposed to be. That the bird would be of a high quality and the standards that were set up to breed the Penobscot were so.
Q. And he believed that, you're saying.
A. I believed it.

Q. I know, but did you believe that he believed it?
A. I believe that Bernie Lewis was not totally involved for a period of time, that he was doing a lot of traveling. I feel that Bernie knew that he was sick.
Q. With cancer.
A. With cancer....
Katz deposition, p. 40.

25. Swanger testified:
Q. What is your understanding of what's been said there [in Katanbaf's report]?
A. What I understood from Manouchehr [Katanbaf] is that there was something amiss in the genetic population as it existed at Bayside. I stressed concern to Bernard Lewis about this condition. He felt that my feelings should be—We should sit down and go over the feelings that I had with Murray [Katz], why I was skeptical of the situation. And ... when Mr. Lewis came down, he again reiterated the position that he ... originally with Murray [sic] that the lines were pure in form, there was nothing the matter with the line....
Q. So the representations were that they were pure in form?
A. Yes.
Q. What else?
A. That there was nothing the matter with the genetics of the progeny of the line and there was no reason to be concerned.
....
Q. And from your prior testimony, you're saying that you did not take comfort in those representations because you knew of Bernie Lewis' lack of technical knowledge for the genetic program, is that correct?
A. Yes.
Q. And you knew from [sic] yourself that there were problems with the line because of experiences in 1984?

■ Moreover, Empire cannot prove justifiable reliance on any of the misrepresentations allegedly made by Bayside, because its management staff was well aware of significant problems with the genetic management of the breed long before the sale was consummated. Many senior management staffers at Empire, including the individual Katz placed in charge of the acquisition, J. Ronald Swanger, were opposed to the sale[26] because of concerns about the genetic management of the breed, as well as other reasons which are not relevant to the discussion here.[27] Swanger and others discussed these concerns among themselves and expressed their concern to Katz.[28] Despite such concerns, Katz remained convinced that the acquisition was a smart move.

> A. Yes.
> Q. And from the observations you had had of the geneticists and the manner of the operation of the program, you were convinced in your own mind that notwithstanding whatever representations that there were problems with the genetics of the progeny in the line?
> A. Yes.
>
> Swanger deposition, pp. 222–24.

**26.** See: Soccio deposition, p. 133.

**27.** Empire management staffers thought the acquisition was financially unwise. Swanger, Soccio, and others thought that the $1.2 million price which Katz had negotiated with Lewis was far too high and that the breed was worth no more than $200,000 to Empire. (Swanger deposition, pp. 109–110 and 135–36; Soccio deposition, pp. 105–06; and Katz deposition, pp. 64–65)

These concerns were echoed by an outside financial consultant Empire retained, Philip Tabasso. Like the others, he also was convinced that the price was excessive. (Tabasso deposition, pp. 49–50)

They were also concerned about the fact that Empire was acquiring far more inventory than it needed for its own processing requirements, and, apparently, had no outlet for the excess. (Soccio deposition, pp. 99–102; Swanger deposition, pp. 106–09 and Katz deposition, pp. 87–88)

**28.** As late as April, 1988, after months of negotiations and fact-finding efforts by Empire, Swanger still had serious doubts about the advisability of the acquisition, which he communicated to Murray Katz, Steven Katz, Alan Katz and Matt Soccio. In a memo dated April 25, 1988, Swanger told them:

> ... I am of the opinion that before we totally commit ourselves to this project, that a more

Due to these mounting concerns, Swanger was of the opinion that Empire did not know enough about the breed and should have investigated Bayside's operation more thoroughly before making a commitment to purchase. (Swanger deposition, pp. 106–07, 136, 222 and exhibit 24 and Katz deposition, p. 57)

These concerns were prompted by a number of items, which included: (1) observations of a marked decline of broiler weights which Empire staffers had been tracking since at least 1986[29] (Swanger deposition, pp. 55–59, 230–31, 238 and 244; J. Appel[30] deposition, pp. 10–15); (2) Bayside's reluctance/unwillingness to hand over all of the genetic selection records which Empire wanted to see pre-sale;[31] (3) first-hand ob-

> clear understanding and evaluation should be given on exactly what we are buying.
> ....
> This project is more complex than you realize and aside from the line, additional monies are going to be required to add the hatchery and house.
> I think we should sit down and give a little more attention to this project.
>
> (Record Document No. 49, April 15, 1991, exhibit 24)

**29.** Empire argues that, although it had experienced weight-gain problems with the breed from 1985 through 1987, these problems did not approach the substantial difficulties which arose after the sale. In other words, they contend that the difference pre-sale and post-sale is one of degree. (Record Document No. 55, filed May 10, 1991, pp. 6–7). See also: J. Appel deposition, pp. 30–31).

We do not find this distinction relevant.

**30.** John Appel, who served as Empire's nutritionist at the time, was convinced that "Bayside had not put forth the genetic selection pressures they should have on the chicken.... before the sale." (Appel deposition, p. 32)

**31.** According to Dr. Barbato, Empire was well aware that certain records were not going to be produced pre-sale, and were advised of this by Lewis himself at a meeting where "everyone" principally connected with the transaction was present. Dr. Barbato testified:

> Q. And was this a remark made for everybody to hear?
> A. I believe so, yeah.
> Q. Did you have the impression as of the second meeting that Bernie Lewis was going to withhold documents and authorize withholding documents and was not going to allow Empire to satisfy itself until after the sale?

servation of Bayside's operation, which Empire staffers to a man found improper, ill-managed and basically unsound; (4) lack of confidence in Dick Koski, the individual in charge of Bayside's breeding operation, and a singular lack of respect for his professional abilities;[32] and (5) an awareness that the Penobscot breed "was not perfect" and that it was known industry-wide as a

> A. That was my impression, yes.
> ....
> Q. Did you object and say, how can you expect us to buy the company if you won't let us see the documents?
> A. I was told that was none of my business and that that was a business decision that was being addressed by Mr. Lewis and Mr. Katz.
> G. Barbato deposition, p. 141.

**32.** Dr. Barbato deposition was singularly concerned about this issue. He testified:

> Q. What are the kinds of things that you wanted to impress upon Ron Katzman about your concerns?
> A. Well, I was very concerned about the lack of records. I was very concerned that we did not—that things were made unavailable to us.....
> .... And I was also concerned because I felt that at the time ... that there was a lack of genetic understanding on all sides of this issue. And I wanted—I wanted my concerns addressed that I was not being provided with the records necessary to make certain kinds of judgments.
> Q. When you say the lack of genetic understanding on all sides, you mean on Empire's side?
> A. No, I mean on all sides. I was very concerned about the lack of genetic information available. I was very concerned about Dick Koski's lack of genetic expertise. I was concerned about the individuals at Empire. While they certainly run an excellent kosher business and they are poultry processors I think without par or without peer, rather, they are not geneticists.
> Q. And what was Ron Katzman's response?
> A. Well, I don't recall any specific response other than they listened to my—everyone involved listened to my concerns, and I assumed that having voiced them that my concerns would be addressed....
> Q. Did you make your views known in an emphatic way?
> A. I certainly did.
> Q. Was it important to your sense of professionalism that you have it right out in the open and you have it very clear that there were some things that you weren't satisfied with?
> A. Yes, and I addressed them to all the individuals concerned in this. And by all of

breed that "put on weight at a slower rate than did other commercial breeds" (Barbato deposition, p. 69).

Swanger was among those convinced that the weight-performance problems Empire had experienced with the breed since 1985 were genetically based.[33] (Swanger deposition, pp. 59–60, and 222–224; and J. Appel deposition, pp. 30–35). He said as

> them, I do not mean only Empire, I mean I addressed them to the people who were at Bayside operations.
> ....
> I expressed them to Bernie Lewis when we went to dinner with him when I was visiting with Ron Swanger in the spring. And I addressed them to Ron. I addressed them, to Murray Katz and I addressed them to Manouchehr [Katanbaf], because I knew he was getting involved in a situation where he may not have—he may have to develop information. You know, he would have to hit the ground running and develop some of these data on his own.
> ....
> And it was made very clear that this was not my area of interest and not why I was there, because these were business decisions that were going to be made by businessmen.
> G. Barbato deposition, pp. 99–102.
> See also: Swanger deposition, pp. 59–61.

**33.** With reference to a report prepared by Dr. Barbato (Swanger deposition exhibit 40), Swanger testified:

> Q. Did you understand that what Guy Barbato was saying was that the genetic management of this line or this breeding operation was a relatively unsophisticated rudimentary process of selecting almost exclusively on body weight?
> A. Yes.
> ....
> Q. What impressions did you have of the genetic management of these chickens as a result of your inspection by Dr. Guy Barbato?
> A. I felt that the operation was mismanaged. I believed that the geneticist did not fulfill his obligations to Bayside in the proper management of the lines. And, by doing so, he's left in the hands of laymen the responsibilities of performing his selections without even following up to see if the selection procedures that he had outlined were being done accordingly to accepted genetic practices.
> ....
> Q. And you reached these conclusions on or about June the 14th?
> A. Yes.
> Q. And did they confirm the conclusion that you had previously had wherein you had no respect or trust for Dick Koski as a geneticist?
> A. Yes.
> Swanger deposition, pp. 168–69.

much to Dr. Manochehr Katanbaf prior to the sale. Katanbaf was told that Empire was "not happy with the bird as it compares to middle of 1980s" and thought that the breed was deteriorating. (Katanbaf deposition, p. 150) [34]

Katz himself recognized that there were significant problems with Bayside's breeding operation. He thought that Bayside had management problems, and, like Swanger, had a low opinion of Koski's professional abilities. (Empire fired Koski shortly after taking over the Bayside operation.) (Katz deposition, pp. 57 105–06 and 118) Katz was also aware of his staff's views about possible or probable genetic deficiencies in the breed, but believed that Empire could improve the breed after the acquisition. (R. Eldridge deposition, p. 63)

Dr. Manochehr Katanbaf, the geneticist whom Empire hired to oversee the Belfast, Maine breeding operation after the acquisition, began his duties three weeks prior to the closing date. He found the conditions awaiting him distressing, and later testified [35] that this aroused concerns about the genetic management of the breed.[36] He sent back a report of this to Empire, specif-ically to Swanger, who shared them with Katz. (Swanger deposition, p. 158 and exhibits 34, 43 and 44) Despite Katanbaf's report, neither Swanger nor Katz asked him for further information or his opinion on the genetic management of the breed prior to consummating the sale on July 7th. (Katanbaf deposition, pp. 29 and 70)

Plaintiffs attempt to discount the impact of Katanbaf's report by contending that, by that time, they considered themselves irrevocably committed to the acquisition. (See: Swanger deposition, p. 192) This contention is not supported by the facts. Nothing was signed until the date of closing, July 7, 1988. (Although the letter of intent bears a June date, plaintiffs do not dispute that it was not executed until the date of the closing.)

From all of this, only one inference may reasonably be drawn. Empire was well aware of the genetic decline of the breed and the problems associated with that decline prior to the sale, and therefore has no conceivable basis for an assertion that it justifiably relied on representations by Lewis, Koski,[37] or other Bayside staf-

---

**34.** Swanger stated that it was futile for the management staff to debate the decision with Katz, because:

> .... When Murray [Katz] has confidence and trust in an individual, whatever I said wouldn't have made any difference.

(Swanger deposition, p. 172) Katz conceded that this was true, stating that in his view, from the beginning, the deal "was done, it was etched in stone". (Katz deposition, pp. 59 and 101)

**35.** Dr. Katanbaf testified:

> Q. Did that [the deplorable housekeeping conditions] lead you to have any concerns about the genetic program being conducted by Bayside?
> A. You may get some ideas, but not necessarily. You would think that genetically the bird was mismanaged.

(M. Katanbaf deposition, pp. 28–29)

**36.** Dr. Guy Barbato, another outside geneticist whom Empire hired for advice prior to the sale gave the following account of his observations of the Bayside operation prior to the acquisition by Empire:

> 6/1/88
> Began visit at Bayside (Belfast, ME) with tour of all facilities. Steinhort Farm provided the hub of the primary breeder housing the pedi-gree pens and most of the multiplier flocks (not including surplus breeders and primaries)
> [In discussing the breeding program and the lines selected, Dr. Barbato observed:]
> The problems related by Empire appear to be due to two major facts:
> 1) Line 71 male is a Cornish-type bird having large linear growth and relatively poor fleshing.
> 2) Female lines 105–11 and 71–32 are provided indiscriminately to Empire without regard to flock uniformity and/or performance.
> 6/2/88
> After discussions with D. Koski, it is apparent that he is a breed manager but not a geneticist.
> Clearly, mistakes have been made with the female lines that have contributed to ... growth and conformation variation and perhaps most seriously, efficiency of production.... We have no idea what the relative contribution of the male line would be to the program, other than slow growth rate and concomitant low feed efficiency.

(Record Document No. 49, filed April 15, 1991, Barbato exhibit)

**37.** Dr. Barbato warned Bayside's counsel that he was disturbed by Koski's uncommunicativeness. He testified:

fers. Uncontroverted facts make it apparent that Empire proceeded with the knowledge that the operation had significant problems, but due to the perceived need to preserve availability of the Penobscot line and the perception that with better management, the problems could be turned around, they elected to take the risk. They cannot now plausibly assert that they were defrauded into agreeing to the acquisition.

### Implied oral contract

■ Empire alleges that it had an implied oral contract with Bayside based on the past course of dealing between the parties. Empire argues that "a jury should be allowed to infer" that Bayside had impliedly agreed to maintain a certain level of quality in the genetics of its breeding program in exchange for Empire's continuing purchase of Penobscot eggs and young poultry.

Empire has produced nothing which substantiates its claim that such a contract existed, and everything we have seen points to the conclusion that it did not. Empire argues in non-sequiturs. It contends that a jury should be permitted to infer the existence of an implied contract of quality assurance because: (1) the parties had a continuous purchaser/supplier relationship "for at least twenty years" prior to the acquisition of the breed; (2) in the past, Empire had been happy with the performance of the Penobscot and had been able to produce a quality product with it; (3) the two companies had a good working relationship prior to the sale such that, if Empire experienced difficulties with the birds, Bayside would send down its geneticist to offer suggestions; and (4) during the weeks prior to the closing, Bernie Lewis offered quality assurances about the

breed. (Record Document No. 55, pp. 54–55)

None of these contentions in any way support the existence of an implied contract. Summary judgment will, therefore be entered in Bayside's favor on Count V.

### Bayside's counterclaim

■ Bayside's counterclaim is based on breach of the promissory note. The note in the amount of $1 million represented the balance of the $1.2 million purchase price and was executed by Mattern [38] in favor of Bayside. It provided, *inter alia,* for monthly payments to Bayside of $16,666.67 ending on June 1, 1991. It also contains a standard acceleration clause and provides for the award of costs and reasonable attorneys fees in the event of default if suit is filed. Empire guaranteed the note. (D. Lewis [39] affidavit, exhibit "D") As security for the note, Mattern granted Bayside a security interest in the breed.

Empire and Mattern ceased paying on the note in August, 1990, and have affirmatively repudiated it. On September 25, 1990, Bayside accelerated the note and demanded that Empire immediately pay the remaining balance of $466,666.58. Empire has refused, and Bayside now seeks the principal owed, plus accumulated interest at 10 percent per annum and expenses, including counsel fees, under the terms of the note. (Lewis affidavit, paras. 11–16, and exhibit "G")

In defense of the counterclaim, Empire makes the same allegations relied upon in its fraud and contract claims, i.e. that it was deceived into purchasing a breed which failed to live up to its reasonable expectations. As discussed above, those claims are meritless. Empire has asserted no viable defense to the counterclaim for payment, and summary judgment in Bayside's

Q. You were warning the lawyer not to rely upon that individual [Koski] or information that individual gave?
A. Well, yes, I said to be careful. It may or may not be accurate. I believe that's what I said.
Q. Right. Is that a fair characterization of saying don't rely upon him?

A. Well, I suppose so.
G. Barbato deposition, p. 109.

**38.** Technically, Mattern was the purchaser of the breed.

**39.** David Lewis is president of Bayside.

favor in the amount of $520,876.63 [40] plus costs and counsel fees, which are yet to be determined,[41] is therefore appropriate.

*Remaining motions*

In light of our grant of Bayside's motion for summary judgment, its motion to compel discovery will be denied as moot. Plaintiff's motion for leave to file an additional brief will likewise be denied, since we find the arguments made in the first set of briefs decisive, and perceive no need for additional briefs. Plaintiffs' original 67–page brief is sufficient.

---

**40.** This figure represents the balance of the principal, $466,666.58 plus interest calculated as follows:

| Time Period | Interest Rate | Interest Due |
| --- | --- | --- |
| July 2, 1990 to August 29, 1991, both inclusive | 10% (contractual) | $54,210.05 |

The court has determined from the record, including the promissory note (Exhibit C to Appendix of Affidavits of Bayside's Motion for Summary Judgment, filed April 15, 1991) that interest and principal were paid through the installment due July 1, 1990. Interest on the unpaid balance of principal would accrue thereafter.

**41.** Bayside has produced an affidavit from counsel stating that counsel fees of $141,658.65 have been incurred as of March 27, 1991. We will require an up-to-date accounting and detailed statement before we assess fees and costs.