No. 48,028

GERALD P. TIMI and TOM TIMI, GERALD P. TIMI and TOM TIMI, d/b/a TIMI BROTHERS, and PETE TIMI, *Appellants,* v. PRESCOTT STATE BANK, a corporation, and R. G. MURROW, *Appellees.*

(553 P. 2d 315)

Opinion filed July 23, 1976.

*Richard G. Tucker,* of Erie, argued the cause, and *Charles F. Forsyth* and *Clark M. Fleming,* both of Erie, were with him on the brief for the appellants.

*Richard L. Roberts,* of Olathe, argued the cause, and *George A. Lowe,* of Olathe, was with him on the brief for appellee Prescott State Bank.

No appearance for appellee R. G. Murrow.

The opinion of the court was delivered by

HARMAN, C.: This is an action for a money judgment by three individuals engaged in the cattle business against a bank and one of its officers, based upon their guaranty of payment for cattle sold by plaintiffs to a cattle buyer and misrepresentation as to the cattle buyer's financial ability. Plaintiffs appeal from the rendition of summary judgment against them (summary judgment was not granted as to one transaction and that claim is still pending in the trial court).

Appellants Gerald P. Timi and Tom Timi are sons of appellant Pete Timi, all of whom live near Girard where they are engaged in general farming and livestock operations. In 1973 Gerald and Tom entered into a partnership called Timi Brothers for the purpose of investing in the hog futures market and purchasing cattle to feed and sell. This suit arises out of a series of cattle purchases by one Mike Mangum from Timi Brothers and each appellant individually. Mangum, who had been a feed salesman, ventured into the cattle business with funds advanced by one Clyde Albright, a Fort Scott cattle dealer. Mangum had a checking account at appellee Prescott State Bank in which he deposited a check for $71,500 given him by Albright. Mangum bought cattle from appellants and paid for them with checks drawn on this account. He resold the cattle to Albright. Appellee R. G. Murrow, who was thirty-two years of age, was a vice-president of the Prescott State Bank, its loan officer and managing officer. When summary judgment was entered the trial court had before it the depositions of all principals in the case.

Commencing January 12, 1973, and ending February 4, 1973, appellants sold and delivered to Mangum in ten separate transactions 347 cattle for which they were given checks on the Prescott bank. These checks, totaling $126,600, were honored and paid and these sales form no part of this lawsuit.

On February 8, 1973, Gerald Timi sold Mangum forty-seven

head of cattle and received therefor Mangum's two checks totaling $25,000 drawn on the Prescott bank; when presented several days later these checks were dishonored for insufficient funds and have never been paid. Also on February 8, 1973, Tom Timi sold eighteen head of cattle to Mangum for which he received a $7,700 check on the bank which was similarly dishonored. On February 13, 1973, Timi Brothers sold 100 head of cattle to Mangum and received two $17,000 checks on the bank, each of which was dishonored (this is the transaction pleaded in paragraph VII of appellants' petition upon which summary judgment was not sought or granted because of facts peculiar to it alone which will be stated later). On February 13, 1973, Gerald Timi sold fifteen heifers to Mangum for $4,500. No check was given on this transaction and the agreed price was never paid. On February 14, 1973, Timi Brothers sold forty-four steers and heifers to Mangum. A price was never agreed upon by the parties as to these heifers; these cattle had just been purchased by Timi Brothers for $15,147.53 at the Parsons stockyard. The last transaction was on Thursday, February 15, 1973, when Tom and Pete Timi sold Mangum fifty-two heifers for $31,000; again no check was given and this purchase was never paid for (by way of explanation it may be noted Mangum testified he frequently picked up cattle from the Timis and they would agree on a price later; when he gave the Timis checks they were to hold them until told the checks would clear).

Everything went serenely with appellants' and Mangum's business relationship and appellants were pleased with the profit they were making from the quick turnover of cattle bought and then sold to Mangum until Saturday, February 17, 1973, at which time Mangum telephoned Gerald Timi and advised he was broke and had no more money. (The Timis testified they had not deposited the checks for the two February 8th sales because of a death in the family; they had previously deposited the two $17,000 checks because they needed the money.) Mangum told Gerald the two $17,000 checks would go through all right.

During midafternoon on Sunday, February 18, 1973, Mangum telephoned vice-president Murrow and told him he was broke. At that time Murrow had in his pocket two uncashed checks given him by Mangum totaling $27,000, the balance due for 106 cattle which Murrow had personally sold on his own account and delivered to Mangum on Thursday, February 14th. On Sunday eve-

ning, February 18th, Murrow went to the bank. There he found the two $17,000 checks written by Mangum to the Timi Brothers on February 13th which had been received by the bank on Friday, February 16th. Murrow deposited his two checks for $27,000 and changed the bank's penciled records, which would later be machine-posted, to show that his two checks had been received by the bank on Friday prior to those of the Timi Brothers. Murrow marked the Timis' checks as dishonored for insufficient funds and mailed them back on the night of Sunday, February 18th. With his checks from Mangum he purchased a draft which he owed on the cattle. (Murrow's position at the bank was terminated about August 1, 1973.)

Appellants' basis for their contention of guaranty of payment by the bank and fraudulent representation as to Mangum's ability to pay for cattle purchased by him consists of five separate contacts between them and Murrow—three by Gerald, one by Tom and one when both Gerald and Tom were present. The first contact was in January, 1973, on the first occasion appellants sold cattle to Mangum. Gerald Timi testified that at Mangum's instance he telephoned Murrow and asked if Mangum had enough money in the bank to pay for $9,600 worth of cattle; Murrow said "Yes"; Mangum's check for this amount was subsequently paid. Another contact occurred sometime later in January when Gerald and Tom went with Mangum to Prescott. They had coffee with Murrow in a local restaurant. Timis as individuals had already made a few sales to Mangum at this time. Gerald testified as to the conversation:

"Q. All right. Now, what was the conversation you had in the restaurant?

"A. Oh, just kind of everyday talk about the weather and this and that, and then we asked Murrow about Mike's bank account and told him that Mike wanted to buy cattle from us and how good was he? Was he good enough to go ahead and deal with? And that was about it, other than just general BS.

"Q. This was all while you were in the restaurant having coffee?

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Did Murrow indicate the amount of money he had in his account on that occasion?

"A. No, sir.

"Q. Was there any discussion about Albright?

"A. No, sir.

"Q. Just general shooting the breeze or shooting the bull; is that it?

"A. That is all, and more or less just my brother and I wanting to know how good Mike was, you know, if he was—had enough money to go ahead and pay for these cattle.

"Q. Which cattle?

"A. Well, any cattle that we would sell him. Because by this time we were —I mean, I had sold him quite a few, my brother had sold him a few head and we told him we were going to go back and buy some more cattle to put in the feed lot and [he] said, 'I might want to buy them if you get them.' He said, 'I might buy them from you if you buy any more cattle.'

"Q. Mike said this while you were in the restaurant?

"A. Yes.

"Q. What else was said?

"A. That is about it, and we asked Murrow if he wants to buy them, is he good enough to buy them, has he got the money to buy them? He said, 'So far as I know he has.' Didn't say how much he had or anything."

Another contact was in the latter part of January on the occasion of the third sale when at Mangum's suggestion Gerald again telephoned Murrow. Gerald testified:

"Q. What was the conversation you had with Murrow at that time?

"A. Told Murrow that Mike was wanting to buy some more cows from me, and would it be all right, is he good? And he asked me how much and I told him and he said yes—and he says, 'Yes, we will back him up all the way.'

"Q. Did you tell him how much you were talking about?

"A. Yes.

"Q. How much was it?

"A. $6,500.

"Q. What did Murrow say about it?

"A. He just said he was good, that he would back him.

"Q. Well, now, were you asking him about backing him or were you asking him about the $6,500?

"A. I asked him if he had enough money in the bank, and he says, 'Yes, go ahead.'

"Q. To pay the $6,500?

"A. Yes.

"Q. Okay. What else was said in that conversation?

"A. That is about all.

"Q. All right. Let me just ask you and you listen and if this is not correct, you tell me; that the substance of the conversation that you had in the early morning of January 29 with Murrow was whether or not Mangum could pay $6,500 for what, ten head of cattle? Is that correct?

"A. It was—

"Q. And he said yes?

"A. He said yes. Now, this was the early morning of the morning we loaded them, Now, what day that was, I don't remember, if it was on the 1st *and* 29th or not. It was the morning we loaded the cattle. . . ."

Mangum's $6,500 check was honored and paid.

Gerald further testified:

"A. The one [conversation] we were sitting up there drinking coffee at the—when we were buying these cattle. Okay, there was two conversations before that that I talked to him on the phone. He knew Mike, he said, 'We

are real friends.' I knew they were real good friends. And I got the general—the idea that, hell, he was—as far as what the banker told me, Mike was good, and he had the money to pay for the cattle.   .   .   .

*   *   *   *   *   *   *   *   *   *   *   *   *

"A.  Okay. The two telephone calls that I made to R. G. [Murrow] were at Mike's suggestion that I call and ask if Mike had the money in the bank to pay for the cattle. I did that and R. G. said yes, he was good, his checks would be paid, which they were.

*   *   *   *   *   *   *   *   *   *   *   *   *

"Q.  (By Mr. Tucker) On the third occasion when you visited with R. G. Murrow, I believe you testified that you had this visit over coffee. On that occasion did you—what did you discuss?

"A.  Mike's ability to pay for the cattle that we were selling.

"Q.  And what specifically did R. G. Murrow tell you?

"A.  That so far as he knew, he had the money and that he was good.

"Q.  Was this for a specific set of cattle?

"A.  No, this was for any future cattle that we bought and sold. We were kind of wanting to know how good Mike was. We were wanting to look at his background a little bit, to find out a little bit about the man.

"Q.  So this was your impression, then, from this conversation with Mr. Murrow?

"A.  Yes.

"Q.  Can you tell in any more specific detail what specifically Mr. Murrow said to you to give you this impression?

*   *   *   *   *   *   *   *   *   *   *   *   *

"A.  Yes. Well, like I said, I can't remember everything we said or everything we talked about, but Mr. Murrow said that Mike had been banking with him for quite awhile, had never had any trouble with any financial problems, that he always made his—well, he always had the money—seemed to have enough money for us to go ahead. He said, 'I don't think you have any problem.' That was about the general—(pause)."

The fourth contract was by Gerald Timi on February 15 at Tom Timi's farm on the occasion of the last sale of cattle. Murrow was there helping Mangum load the cattle. Gerald testified:

"Q.  What conversation did you have with Murrow on that occasion?

"A.  Just some more straight BS-ing at him because he didn't know how to load cattle, he kept slipping and falling down on ice and I got to laughing at him and I finally asked him, I said, 'Hey, has this guy got enough money to pay for all these cattle?' He said, 'Yes, he is good so far as I know.'

"Q.  Is that all the conversation you remember on that occasion?

"A.  Yes.

"Q.  And on that occasion Murrow said, 'He is good so far as I know'—

"A.  He just said he is—

"Q.  Good?

"A.  I don't remember if he said so far as I know, he just said he was good enough for them. He said, 'Yeah, he has got the money.'

"Q.  Well, what did he say?

"A. I don't remember exact words. I asked Murrow, 'Is this guy good enough to pay for these cattle? Has he got money enough to pay for these cattle, in a joking way, I was just joking with him, just shooting the breeze with him, and I don't remember his exact words, but it was enough to make me realize, or think that, well, we have got nothing to worry about, the banker is here loading them, he has always been good before, his money has always been good, there has never been any trouble collecting any checks from him."

Gerald also testified that when the cattle were being loaded at Tom's place ". . . they were shooting the breeze, and he asked in a joking way if Mangum could pay for the cattle, and Murrow said he was good as far as he knew; that there had been no mention of the purchase price that day, and no one asked if there was $31,000 in Mangum's account." He further testified he did not discuss with Murrow the two checks for $25,000 for cattle sold on February 8 and there was no conversation as to a guaranty that those checks were good.

The fifth and last contact relied upon by appellants was also on February 15 when Tom Timi met Murrow and Mangum on the road in the afternoon after the cattle bought that day had been loaded into trucks. Tom gave this testimony:

"A. Yes, only except when he left, after he loaded them when he was out there, I met him on the road and he stopped and I asked R. G. if he had money to pay for them heifers and he said yes.

. . . . . . . . . . . .

"A. They had the cattle loaded and they was leaving.
"Q. (By Mr. Lowe) Which, now, is this the last day?
"A. That is the last 52 heifers, and Mike and R. G. was coming down the road and I stopped—or I stopped and they stopped and Mike said, 'We got the cattle loaded,' and I asked R. G. if he was all right to pay for them and he said yes.

. . . . . . . . . . . .

"A. I just asked him if Mike had the money to pay for the heifers, and he said yes.
"Q. How much money was that?
"A. $31,000.
"Q. Weren't there 44 other head of cattle shipped that same time?
"A. That morning, yes.
"Q. But you didn't have any conversation about them?
"A. No, I didn't.
"Q. Why was that?
"A. I guess maybe I just didn't think about them.
"Q. You didn't think about them?
"A. No. At least I didn't ask him about them.
"Q. But you just asked about the $31,000?
"A. Yes.

"Q. Well, you hadn't even gotten a check, had you?
"A. No.
"Q. Never did get a check, did you?
"A. No, sir.
"Q. Why didn't you get a check from him while you were out there on the road?
"A. Mike said, 'I'll be down in the morning to pay for them.'
"Q. You mean that in that conversation you didn't even discuss the price of those 44 head of cattle that were shipped that day?
"A. No, sir.
"Q. Just so I understand you, in that conversation you made specific inquiry of Murrow if Mangum could pay $31,000 for the 52 head of Charolais; is that right?
"A. Yes, sir, that's right.
"Q. What did he say?
"A. He said yes.

. . . . . . . . . . . . .

"Q. Could he have said, 'As far as I know'?
"A. I don't believe he said that.
"Q. He just flatly said yes; is that correct?
"A. That's right.
"Q. Did he tell you that he would stand good for them or anything of that kind in addition to saying yes?
"A. No."

Tom stated he made no mention of this conversation in answers to interrogatories he had previously given although one question would have called for it. He further testified that when they were starting to deal with Mangum, Mangum had shown him a bank deposit slip for seventy some thousand dollars; the Timis' banker in Girard, Jim Sturtevant, visited with Murrow about Mangum's account; on one occasion Sturtevant called Murrow and inquired whether Mangum had enough money to cover two checks for a little over $20,000 which would be in and Murrow said Mangum had $46,000 in the bank that day (this conversation referred to January checks which were later honored by the Prescott bank). Tom further testified Mr. Sturtevant told him to be careful in his dealings with Mangum.

In addition to his testimony concerning his Sunday night check manipulation appellee R. G. Murrow testified concerning his contacts with the Timis. On two occasions when asked if Mangum's check for a certain amount would clear, he advised each would; at the coffee conversation in Prescott the Timis made no inquiry as to Mangum's financial stability and he gave no assurances as to it; in the conversation with Gerald on February 15 there was no

business conversation—Gerald jokingly asked whether Mangum's check was good; he replied that as far as he knew it was; he had no intent of making a guaranty; he had no conversation with Tom that same day on the road—Tom and Mangum did talk about a future deal; he never told Tom he was backing the deal or that Mangum had plenty of money.

Mike Mangum testified that the discussion over coffee in Prescott was in a kidding or joking mood; the Timis wanted to know if he was any good and Murrow replied that he was; he could recall no guaranties by Murrow at that time or later when Murrow was helping load cattle; when they met Tom on the road there was no conversation regarding guaranty of checks or payment.

In its journal entry rendering partial summary judgment the trial court ruled:

". . . the pleadings, depositions, and answers to interrogatories on file show that there is no genuine issue as to any material fact and that the defendants' motion for summary judgment with reference to paragraphs numbered 6, 8, 9, and 10 of the plaintiffs' petition be, and the same is hereby sustained. The court further advises counsel that in making this ruling the court is assuming as stated in the oral argument presented on October 3, 1974, that the plaintiffs' petition contemplates an action against defendants based upon fraud and misrepresentation as well as upon a contract or guarantee, and the court has not placed any reliance whatsoever upon the testimony of the defendant R. G. Murrow as reflected in his deposition, but has considered only the testimony in the other depositions most favorable to the plaintiffs' alleged cause of action."

Appellants' two-fold contentions here are interrelated: First, that the court erred in rendition of summary judgment because there were material issues of fact in dispute, and second, it erred in failing to place any reliance upon R. G. Murrow's testimony. Appellants seem to be arguing in this last point that the court failed to consider all the evidence before it and that some of Murrow's testimony raised factual issues which cannot properly be resolved by way of summary judgment. We do not interpret the trial court's ruling so as to reach that result. It is true Murrow denied making specific statements as asserted by appellants. This is the testimony the trial court disregarded, and properly so, in reaching its decision. Instead, as stated, it considered only the testimony most favorable to appellants' position, as it was required to do: "Generally before a summary [judgment] may be granted, the record before the court must show conclusively that there remains no genuine issue as to a material fact, and that the moving

party is entitled to judgment as a matter of law. A mere surmise or belief on the part of the trial court, no matter how reasonable, that a party cannot prevail upon a trial will not warrant a summary judgment if there remains a dispute as to a material fact which is not clearly shown to be sham, frivolous, or so unsubstantial that it would be futile to try the case . . . The manifest purpose of a summary judgment is to obviate delay where there is no real issue of fact. A court should never attempt to determine the factual issues on a motion for summary judgment, but should search the record for the purpose of determining whether factual issues do exist. If there is a reasonable doubt as to their existence, a motion for summary judgment will not lie. . . . A court, in making its determination, must give to the party against whom summary judgment is sought the benefit of all inferences that may be drawn from the facts under consideration" (*Lawrence v. Deemy*, 204 Kan. 299, 301-302, 461 P. 2d 770). " '. . . A popular formula is that summary judgment should be granted on the same kind of showing as would permit direction of a verdict were the case to be tried. . . . If there is any question as to the credibility of witnesses or the weight of evidence, a summary judgment should be denied.'" (*Hastain v. Greenbaum*, 205 Kan. 475, 481, 470 P. 2d 741.)

We cannot say the trial court erred in its treatment of Murrow's testimony.

Most of appellants' argument on their first contention—that material factual issues existed which made rendition of summary judgment improper—is based on the denials contained in Murrow's testimony. These contradictions are to be ignored in considering the propriety of summary judgment and those contained in Mangum's testimony as well. The real issue is whether appellants can recover on any theory when full credence is given to the evidence most favorable to them (here discovery was complete and there is no contention other favorable evidence exists which was not before the trial court).

Appellants' petition was framed on the theory of oral guaranty by the bank and Murrow that Mangum's checks would be honored and further that payment of Mangum's cattle purchases would be guaranteed (appellees did not at trial level raise the defense of the statute of frauds with respect to an oral promise to pay the debt of another [K. S. A. 33-106] as required by K. S. A. 60-208 [c] and it may not now be considered).

Here there was no formal certification or acceptance of checks by the bank. Under K. S. A. 84-3-410 and 411 these actions by a bank are to be in writing. The Prescott bank never saw any of the checks before they were delivered to the Timis and in three instances checks were never written.

Before the enactment of the Uniform Commercial Code a check could be accepted by an agreement external to it (10 Am. Jur. 2d, Banks, § 578, p. 548). "A drawee bank makes itself liable by a contract of acceptance extrinsic to the check itself whenever the plain import of the words and language used is that of a contract of acceptance" (Id., § 581, p. 551). Assuming, without deciding, that this rule is still viable, the contract of acceptance external to the check must use language which clearly and unequivocally imports an absolute promise on the part of the bank to pay. ". . . [I]t seems to be a well-settled rule of law that the drawee of a check will not be liable to the holder thereof upon a claimed contract of acceptance external to the check, where the alleged agreement upon the part of the drawee is based upon its statement that the check is 'good,' or 'all right,' or words of like import. Thus generally, an affirmative response by a bank to an inquiry as to whether the check of a certain person for a named amount is good is nothing more than a statement that the drawer has at that time a deposit sufficient to meet the check, and is not an acceptance of the check by the bank." (Id., § 582, p. 552.)

This was the holding in *Bank v. Bank,* 74 Kan. 606, 87 Pac. 746. There the plaintiff bank telegraphed the defendant bank: "Is J. F. Donald's check on you $350 good?" The defendant bank replied by telegraph the same day: "J. F. Donald's check is good for sum named". This court held the telegram only warranted that Donald had that amount in his account at that time and not that the bank would make the check good whenever it was presented for payment. Thus it appears appellants cannot recover on the theory of an agreement of acceptance by the bank under the facts. Their specific inquiries of Murrow were directed to whether Mangum had sufficient funds in his account to cover certain checks given them. There was no request or agreement to accept certain checks and pay them anytime they might be presented.

What about the bank's liability as guarantor of the checks and of payment of purchases where checks were not given? "A guaranty is a contract between two or more persons, founded upon consideration, by which one person promises to answer to

another for the debt, default or miscarriage of a third person, and, in a legal sense, has relation to some other contract or obligation with reference to which it is a collateral undertaking" (*Trego WaKeeney State Bank v. Maier*, 214 Kan. 169, Syl. para. 2, 519 P. 2d 743). Like any other contract, its formation is governed by principles of mutual assent, adequate consideration, definiteness and a meeting of the minds (38 C. J. S., Guaranty, § 8, p. 1143).

Appellants do not suggest how the bank stood to benefit from its alleged guaranty to pay for cattle purchased from them by Mangum and the evidence reveals nothing supporting the element of consideration. More importantly, the conversations between appellants and Murrow, taken in the light most favorable to appellants and disregarding any denials by Murrow or Mangum, simply do not amount to a mutual meeting of the minds that Murrow on behalf of himself or the bank would stand as guarantor for Mangum's checks and purchases. Aside from the two telephone calls respecting checks for a definite sum, the conversations concededly were jocular and unbusinesslike, they were indefinite and vague both as to amounts of money and cattle and scarcely went beyond wishful thinking on appellants' part that everything would turn out all right. Murrow's responses were qualified and equivocal and amounted to no more than statements that Mangum was sound financially so far as he knew. The guaranty contract was not shown.

Neither the record on appeal nor appellants' brief is clear as to just what is asserted to have been fraudulently represented to appellants by Murrow on behalf of the bank. Fraud was not pleaded in appellants' petition either in general terms or with particularity as required by K. S. A. 60-209 (*b*). Appellants' brief is not helpful as to the matter relied upon as a false statement of a material fact, either past or present—the first essential to be proven in an action for fraudulent representation (*Dreiling v. Home State Life Ins Co.*, 213 Kan. 137, 515 P. 2d 757). Fraud seems to have crept into the case in some fashion at the hearing on summary judgment and the trial court encompassed it in its ruling. So far as we can glean any factual misrepresentation by Murrow as to Mangum's financial condition would have to lie in the statements attributed to him: Mangum was good; he was good enough to go ahead and deal with; he had money with which to buy cattle; he was good so far as known; we will back him up all the way (this with reference to a $6,500 check which was honored); Mangum's checks would be paid (referring to checks which were in fact later paid); so far

as known Mangum was good and he had the money (this was for future purchases of cattle); he always seemed to have enough money; Murrow didn't think appellants had any problem; Mangum could pay $31,000 for fifty-two head of cattle; he was "all right" to pay for cattle.

Mere recital of the statements upon which appellants must rely demonstrates the weakness of their position. To constitute actionable fraud the representation must relate to past or present fact, as opposed to mere opinions or puffing or promised actions in the future (*Hawthorn-Mellody, Inc. v. Driessen*, 213 Kan. 791, 518 P. 2d 446). A fact is material if it is one to which a reasonable person would attach importance in determining his choice of action in the transaction involved (*Griffith v. Byers Construction Co.*, 212 Kan. 65, 73, 510 P. 2d 198, 205). Here, again as with the alleged guaranty, the statements in question are equivocal, vague and indefinite. Many of them are clearly qualified by the statement, "so far as I know". There is no indication Murrow was falsifying in this respect—in fact the contrary appears. He was trusting Mangum in a cattle sale he had made with Mangum in which he took checks. There is no showing in the record as to Mangum's other business transactions or his financial condition at any one time, just what caused him to come up short or that Murrow had any knowledge respecting Mangum's impending financial shortage. Wrongful concealment on Murrow's part was not shown. Some of his statements to appellants were patently matters of opinion and some related to actions in the future. False representation requisite to a fraud action was not shown.

Appellants' situation does not bring them within the ambit of our rulings in *Wolf v. Brungardt*, 215 Kan. 272, 524 P. 2d 726, in which in a complex situation a bank customer was permitted recovery against a bank officer for fraud (and breach of contract) in connection with the purchase of a business. The banker concealed information concerning a failing business in which he persuaded a nineteen year old boy and his mother to invest, using money borrowed from the bank. Concealed was the fact the business owed the bank a large indebtedness. Here there is no evidence of concealment or withholding of information by one in a position superior to another inexperienced in the particular business.

Of no more comfort to appellants' case is *Sparks v. Guaranty State Bank*, 179 Kan. 236, 293 P. 2d 1017, and 182 Kan. 165, 318 P. 2d

1062. In *Sparks* the plaintiff, a Cloud county resident, sold eggs on two separate occasions to a Topeka egg buyer and in payment received checks drawn on the defendant Topeka bank. Just after the second sale, he received a notice from the bank that the first check had been protested. He immediately drove to Topeka, intending to repossess as many eggs as he could, but he first stopped at the bank. A bank officer represented to and assured plaintiff the buyer was not in financial difficulty but was solvent, without doubt he would be paid the check within a week or two, and that the check was the first one given by the buyer which the bank had protested. The plaintiff was persuaded to leave the check at the bank for collection and to refrain from repossessing any of the eggs or taking any legal action to recover the amount of the check from the buyer. In fact, on the date these representations were made, the bank knew the buyer was insolvent, it had previously protested other checks drawn by the buyer and knew the buyer had a substantial "float" of checks waiting at the bank to be paid. After the representations were made the bank, pursuant to a chattel mortgage and note executed to it by the buyer, took possession of the buyer's inventory, including some of plaintiff's eggs, sold them and applied the proceeds to reduce the buyer's indebtedness to it. Later the bank protested plaintiff's second check and it was never paid. Plaintiff was granted judgment against the bank for the amount of the two checks because of false representations by the bank's officer in reliance upon which plaintiff was induced to forbear the remedies of self-help and legal action then available, as a result of which the bank materially profited. This court affirmed. Again there is no similarity in the facts here, putting aside the pending transaction wherein banker Murrow manipulated the records for his own preference.

Appellants say they should have been notified sooner of Mangum's financial instability so they could have exercised self-help or legal action in time to recoup at least a part of their losses. They argue Murrow had a duty on the evening of Sunday, February 18, when he discovered Mangum was going broke, to get in touch with them and state the truth. In fact appellants learned of Mangum's insolvency prior to the time Murrow did and they did immediately attempt, unsuccessfully, by legal action and otherwise, to reclaim their cattle from Albright, who had purchased the last several groups.

Giving appellants the benefit of every favorable inference which can be drawn from the evidence, they did not establish a case submissible to a jury and could not recover on any theory. No genuine issue existed as to any material fact. Trial would have been futile and the matter was correctly terminated by summary judgment.

Judgment affirmed.

APPROVED BY THE COURT.

FROMME, J., concurring. Disagreement with the second sentence in syllabus 2 prompts this special concurring opinion. I cannot agree "A popular formula is that summary judgment should be granted on the same kind of showing as would permit direction of a verdict were the case to be tried." This statement as made equates the showing necessary to sustain or overrule a motion for a directed verdict to a showing necessary to sustain or overrule a motion for summary judgment. This simply is not correct or proper in the usual hearing on a motion for summary judgment. A ruling on a motion for a directed verdict is always made after the introduction and examination of all the plaintiff's available evidence. A motion for summary judgment is made before trial and in most cases before a full disclosure of plaintiff's available evidence.

A summary judgment proceeding should not be turned into a trial on affidavits and depositions, and the parties should always be afforded a trial when there is a good faith dispute over the facts. (*Brick v. City of Wichita*, 195 Kan. 206, 211, 403 P. 2d 964.) On a motion for directed verdict the plaintiff has been afforded a trial as to all plaintiff's available evidence, so in such case the question is not whether there is a good faith dispute over the facts but whether plaintiff has established a prima facie case under the evidence introduced.

The second sentence in syllabus 2 as shown by the reference in the opinion was taken from a quotation appearing in *Hastain v. Greenbaum*, 205 Kan. 475, 481, 470 P. 2d 741. This quotation from *Hastain* was lifted from a general discussion of summary judgments appearing in 3 Barron and Holtzoff, Federal Practice and Procedure, Rules Edition, § 1234, p. 133. The following additional comments appearing in that text place the statement quoted in better perspective:

". . . Flimsy or transparent contentions, theoretical questions of fact which are not genuine, or disputes as to matters of form do not create genuine

issues which will preclude summary judgment. Neither is a mere pleading allegation sufficient to create a genuine issue as against affidavits and other evidentiary materials which show the allegation to be false. A mere scintilla of evidence is not enough to create an issue; there must be evidence on which a jury might rely. A popular formula is that summary judgment should be granted on the same kind of showing as would permit direction of a verdict were the case to be tried. In applying this principle the court should consider both the record actually presented and the record potentially possible at the trial. If there is any question as to the credibility of witnesses or the weight of evidence, a summary judgment should be denied. In some cases summary judgment may be denied because it seems desirable to permit the opposing party an opportunity at a trial to cross-examine the witnesses of the moving party, but usually the opposing party has sufficient opportunity for cross-examination by taking the deposition of those witnesses."

In 10 Federal Practice and Procedure, Wright and Miller, § 2713, beginning at p. 408, a comparison is made of the showing necessary for a grant of summary judgment with that for a directed verdict. The authors of this later work on federal rules indicate some of the differences which I have pointed out. The following quotation from *Pierce v. Ford Motor Company*, 190 F. 2d 910 (C. A. 4th), p. 915, is set forth by the authors:

"Even in cases where the judge is of opinion that he will have to direct a verdict for one party or the other on the issues that have been raised he should ordinarily hear the evidence and direct the verdict rather than attempt to try the case in advance on a motion for summary judgment. . . ."

Similar reasoning on this point may be found in *Firemen's Mut. Ins. Co. v. Aponaug Mfg. Co.*, 149 F. 2d 359 (C. A. 5th), p. 363, where it is said:

". . . We do not think the judge ought on a motion for summary judgment to have considered the affidavits attacking or sustaining the character of the witness. He should not have concerned himself at this time with the question what he would do if the jury should render a verdict for plaintiffs. A judge indeed does not know what he would do in that regard until he has heard the trial in open court before the jury and has the benefit of the opinion of the jury expressed in their verdict. Only when the evidence is such that it is clear the jury would have none to go on, though they believed that unfavorable to the movant for summary judgment, can the motion be sustained and a jury trial denied."

I must respectfully disagree both with Barron and Holtzoff, as to the so-called popular formula, and with the majority of the court in adopting the same. The rule as adopted will lend confusion to the body of Kansas law governing rulings on summary judgments and it is unnecessary to a decision in this case.

However, I concur in the decision ultimately reached by the

court in the present case. The record before this court shows there is no good faith dispute as to any material fact as to plaintiffs' alleged claims brought upon the theories of guaranty by contract and actionable fraud. They simply cannot establish them under their own admissions. The record indicates that all parties to the action including the defaulting cattle buyer were deposed. The adverse parties fully cross-examined those deposed. At the hearing on defendants' motions for summary judgment and on appeal no claim is made that material evidence in favor of the plaintiffs was unavailable or not before the court. The admissions of the plaintiffs in their depositions established that under the facts admitted and the law cited in the opinion of the court they could not successfully maintain claims against the defendants based either on guaranty or actionable fraud. In such case summary judgment is proper. (*Mechtley v. Price*, 217 Kan. 344, 347, 536 P. 2d 1385.)

Accordingly I concur in the affirmance of the judgment.