**Leo F. and Laurene SPRAGUE, et al., Plaintiffs,**

v.

**PEOPLES STATE BANK, COLBY, KANSAS, et al., Defendants.**

**Civ. A. No. 92–1428–MLB.**

United States District Court, D. Kansas.

Feb. 2, 1994.

**664**

Monte A. Vines, Adams, Jones, Robinson & Malone, Wichita, KS, Francis A. Benedetti, Robert H. Dee, Benedetti & Dee, Wray, CO, for plaintiffs.

Kenneth J. Eland, Sloan & Eland, Hoxie, KS, for Peoples State Bank, Colby, Kan.

Robert W. Ketter, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, for Jeff Torluemke.

Thomas Clayton Boone, Hays, KS, for Leonard Schaben.

### MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on Torluemke's and the Peoples State Bank's (hereinafter Torluemke or the bank or defendants) motion for summary judgment, pursuant to Fed.R.Civ.P. 56. (Docs. 49 and 51)

#### Uncontroverted Material Facts

In the latter part of 1990, Larry Sprague learned from a friend, Dwayne Stroh, about a custom hog feeding business owned by Leonard Schaben. Stroh informed Sprague that he was earning a 22% return on his money by custom feeding his hogs with Schaben. Schaben's feedlot was located in Rexford, Kansas, and did business under the name Schaben Farms, Inc.

Sprague and his brother Leo A. toured the feedlot with Schaben on January 15, 1991. During the tour, Schaben said, "If you have any questions, call my banker Jeff Torluemke." Schaben informed Larry Sprague that Torluemke presently was a customer of Schaben's feedlot. He told Larry Sprague that he had a loan at Peoples State Bank for some equipment and that he had changed his business from a farrow to finish operation to a custom feeding operation in order that he would not need an operating loan for the business.

On the same day as the tour, without contacting Torluemke, Larry Sprague entered into a contract with Schaben Farms and paid $21,086.80 for 476 hogs. Shortly thereafter, he informed his parents, Leo F. Sprague and Laurene Sprague, about his tour of Schaben Farms and the fact that he had entered into a contract with Schaben Farms. Upon hearing the news, Leo F. and Laurene Sprague expressed an interest in doing business with Schaben Farms. Over the next three weeks, the Spragues had approximately 20 discussions among themselves about the possibility of purchasing Schaben Farms hog contracts.

On February 5, 1991, as the Spragues[1] were once again discussing Schaben Farms hog contracts, one of them suggested they should call Jeff Torluemke.[2] Laurene Sprague contacted Jeff Torluemke by telephone to make a reference inquiry concerning Leonard Schaben and Schaben Farms. Laurene Sprague stated, "This is Mrs. Leo Sprague and we are thinking of investing in Schaben hogs and we wondered if there was any problems with his finances that we needed to worry about."[3] According to Mrs.

---

1. Leo F., Leo A., Larry and Laurene. The other plaintiffs were not present during the call.

2. Torluemke was president of the Bank during the period of time relevant to this lawsuit.

3. The court notes that in describing the conversation, Mrs. Sprague mixed present and past tense: "*are* thinking of investing ... we wondered if there *was* any problems ... that we *needed* to worry about." The mixing of tenses is grammatical. Based on the totality of Mrs. Sprague's

Sprague, Torluemke replied, "There are no problems, everything is fine, and I am feeding about 2,000 head myself." Laurene Sprague replied, "That was what we were worried about, thank you." The entire phone call lasted approximately a minute or minute and a half.[4]

At the time of Laurene Sprague's phone call to Torluemke, the only loan Schaben or Schaben Farms had at the bank was an installment loan for a pickup truck and trailer, and Schaben had performed as agreed on that loan. Schaben Farms also maintained a checking account at Peoples State Bank, and it is uncontroverted that the account had been and was being maintained in a satisfactory manner as of February 5, 1991.

At the time of his conversation with Laurene Sprague, Torluemke had previously had one or two informal discussions with Schaben about the possibility of Peoples State Bank loaning money for Schaben's business. The last of these conversations apparently occurred in 1989. Torluemke mentioned these discussions to the bank's loan committee and received a cool response. In the course of their discussions about Schaben, the committee noted that Schaben was historically slow in presenting information and had a prior bankruptcy in 1984 or 1985. The committee also mentioned rumors "circulating by some people around town" that Schaben had concealed some assets in the course of the bankruptcy proceedings.

In addition, on June 21, 1989, Torluemke had had a conversation with Millard Hanson, Schaben's hog loan officer at Producers Livestock Credit Corporation (Producers). Torluemke was aware when he spoke with Laurene Sprague of Hanson's unproven feeling, as expressed in 1989, that Schaben was selling hogs secured to Producers and not sending in the proceeds. Hanson had no evidence that Schaben was doing this, but hoped that Torluemke would "insinuate" to Schaben that if such practices were occurring, they be discontinued. By his comments, Hanson was attempting to send Schaben a message, through Torluemke, that Producers did not want Schaben to be late anymore. In the same 1989 phone call, Hanson told Torluemke that "stringent loan conditions needed to be in place to make Schaben produce effectively." Although Schaben continued to be late making payments to Producers following Hanson's telephone conversation with Torluemke in 1989, Producers entered into another loan agreement with Schaben after Schaben paid off the first loan at Producers in full. Schaben paid off the second loan in a timely manner.

In February, 1991, various Sprague family entities spent $129,285 to buy and custom feed 1,521 hogs at Schaben Farms.[5] Every hog contract initiated by plaintiffs between January 15, 1991, and March 28, 1991, paid out according to its terms. Plaintiffs used the proceeds of those contracts and additional monies to purchase additional hog contracts from Schaben Farms. Between March and August, 1991, plaintiffs spent $450,666 to buy and custom feed approximately 5,302 hogs at Schaben Farms.

testimony, as well as that of her husband and son, it is clear that she did not call Torluemke for the purpose of inquiring about Schaben's *past* finances. It would be unreasonable to infer the Spragues were going to base their decision to make a *present* investment only on information about Schaben's *past* finances.

4. The court has based its decision on Laurene Sprague's recollection of the telephone conversation. Larry and Leo A. Sprague were listening to Mrs. Sprague's side of the conversation and their recollection of what Mrs. Sprague asked Torluemke is slightly different. Mrs. Sprague does not dispute what Torluemke told her; rather, she merely believes he should have told her more. (Uncontroverted Facts 31, 33–36 and 51–54 and responses thereto.) These differences in recollection and Mrs. Sprague's *opinions* regarding what Torluemke *should* have told her do not create disputes of material fact regarding what was actually said.

There appears to be a dispute regarding whether the call to Torluemke was "crucial" to the Spragues' decision to purchase more contracts. (Uncontroverted Facts 25 and 27 and responses thereto.) For purposes of this order, the court will view the facts in the light most favorable to plaintiffs and find that plaintiffs relied on Torluemke's statements during his conversation with Laurene Sprague.

5. There is a minor dispute regarding the amount of the contracts and the numbers of hogs but the dispute is not material to the issues presented in the motion.

On August 2, 1991, the bank's Vice–President, Michelle Patmon, noticed that a high volume of funds had passed through Schaben Farms checking account during the previous month.[6] As a result, Patmon decided to visit the Schaben Farms feedlot with her husband Lenny, a farmer familiar with hogs. Lenny Patmon advised his wife that he believed there were not more than 5,000 hogs in the lot. Patmon briefed Torluemke about the Schaben Farms checking account and her visit to the feedlot. A few days later, a board of directors meeting was convened to discuss the matter. At the meeting, Patmon advised the directors that the bank had approximately 11,000 hogs pledged as collateral on loans valued at $412,000. The bank subsequently sent letters out to loan customers doing business with Schaben Farms asking them for information about the collateral. No bank customer was successful in obtaining the information from Schaben Farms. The bank then attempted to conduct a complete on site inspection and verification of its collateral, but Schaben denied the bank representative access to the property. The bank's subsequent efforts to obtain information about its collateral were unsuccessful.

On October 2, 1991, Schaben Farms filed a Petition for Receivership in Thomas County District Court. On November 6, 1992, Schaben pled guilty to 18 counts of mail fraud, wire fraud, and illegal monetary transactions in federal court arising from the fraudulent operation of the hog feeding operation. He was sentenced to serve several years in federal prison and is currently incarcerated.

Plaintiffs commenced this diversity suit against the bank and Torluemke, alleging fraud, negligent misrepresentation, and civil conspiracy and aiding and abetting Schaben to violate the Kansas Securities Act.

*Standards for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enters., Inc. v. United States,* 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993). This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). Once the moving

---

**6.** In their response (Doc. 57, p. 20) plaintiffs contend that "Every month for years, the volume of funds flowing through the account was far in excess of the amount expected for an 8,000 head hog feedlot." Plaintiffs apparently base this contention on bank statements produced during discovery. Assuming, for purposes of the motion, that the statements show large amounts of cash moving through the account prior to August 1991, that fact, standing alone, does not constitute evidence that the volume of funds was far in excess of the amount needed to run Schaben's feedlot. There is no evidence that prior to February 1991, Torluemke knew, as facts, either that large amounts of cash were moving through Schaben's checking account or (assuming it to be so) that the volume of funds was far in excess of the amount needed to run one feedlot.

party properly supports its motion, the non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Muck v. United States,* 3 F.3d 1378, 1380 (10th Cir.1993). The court reviews the evidence in a light most favorable to the nonmoving party, *e.g., Thrasher v. B & B Chemical Co., Inc.,* 2 F.3d 995, 996 (10th Cir.1993), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

### Fraud

■ The law in Kansas is clear that when one undertakes to answer a financial inquiry regarding a third party and there is no fiduciary or contractual relationship between the party inquiring and the party being inquired of, the party is under a duty to answer truthfully. *Metal Trading Services v. Trans–World Services,* 781 F.Supp. 1539, 1545 (D.Kan.1991) (citing *DuShane v. Union Nat. Bank,* 223 Kan. 755, 576 P.2d 674 (1978)). Plaintiffs' fraud claim is based solely upon Laurene Sprague's February 5, 1991, telephone conversation with Torluemke. Plaintiffs contend that Torluemke's statement "There are no problems, everything is fine" was a misrepresentation[7] upon which they relied and sustained damages as a result thereof.

■ In order to survive a motion for summary judgment on their fraud claim, plaintiffs must establish by clear and convincing evidence a prima facie case that the statements made by Torluemke were untrue statements of material fact, known by Torluemke to be untrue when he made them, made with the intent to deceive the plaintiffs or made with reckless disregard for the truth, and the plaintiffs justifiably relied upon the misrepresentations and acted to their injury or damage. *Mattern Hatchery v. Bayside Enterprises,* 775 F.Supp. 803, 809 (M.D.Pa.1991); *Nordstrom v. Miller,* 227 Kan. 59, 65, 605 P.2d 545 (1980). To be clear and convincing, evidence must be "clear" in

the sense that it is certain, plain to the understanding, unambiguous and "convincing" in the sense that it is so reasonable and persuasive as to cause the fact finder to believe it. *Royal College Shop v. Northern Ins. Co. of N.Y.,* 895 F.2d 670, 681 (10th Cir.1990).

Defendants argue that plaintiffs cannot prove that Torluemke's statements were untrue. Defendants point to the uncontroverted facts that as of February 5, 1991, the only loan Schaben or Schaben Farms had with the bank was being performed according to its terms. Additionally, the checking account of Schaben Farms at the bank was and had been performing in a satisfactory manner.

■ Plaintiffs counter with three circumstances they contend raise a genuine issue of material fact with respect to the truthfulness of Torluemke's statements. First, plaintiffs contend that Torluemke's statements were untrue because he knew that the bank's loan committee had rebuffed Schaben's informal inquiries about a loan for his hog operation. (Doc. 57, pp. 15–16) Second, plaintiffs point to Torluemke's knowledge of Hanson's suspicions. (Doc. 57, pp. 19–20) Third, plaintiffs cite large amounts of cash moving through Schaben's checking account, as well as information that Schaben was selling contracts for more hogs than the capacity of his feedlot permitted. (Doc. 57, pp. 20–22)

In the court's view, none of these three circumstances raises a genuine issue of material fact about the truthfulness of Torluemke's statements. In order for Torluemke's statements to constitute actionable fraud, they must have been made as to existing and material fact. *DuShane,* 223 Kan. at 759, 576 P.2d 674 (Citation omitted). Moreover, plaintiffs are required to prove that Torluemke must have known that the statements were untrue or he must have made them with reckless disregard for the truth. In addition, plaintiffs must show that the statements were of such a nature that they reasonably were calculated to deceive plaintiffs and to induce them to do what they

---

7. It is clear that plaintiffs have elected to base their claims on misrepresentation rather than on omission. (Pretrial Order, Doc. 58 and Response to Motion for Summary Judgment, Doc. 57, p. 39)

otherwise would not have done. *Weigand v. Union Nat'l Bank of Wichita,* 227 Kan. 747, 753, 610 P.2d 572 (1980).

The statements made by Torluemke were "There are no problems, everything is fine, and I am feeding about 2,000 head myself." There is no dispute that Torluemke's statement regarding feeding 2,000 hogs is true. Thus, it cannot serve as a basis for plaintiffs' fraud claim. This leaves his statements that "There are no problems, everything is fine...." [8]

On February 5, 1991, "everything was fine" and "there were no problems" regarding Schaben's finances at the bank. His loan was current and his checking account was being maintained in a satisfactory manner. Thus, there was nothing false about Torluemke's statements insofar as the bank was concerned. In the absence of direct evidence of a false statement, plaintiffs argue that regardless of the status of Schaben's accounts at the bank, it can be *inferred* from Torluemke's knowledge of the rumors, suspicions, etc., that he knew that things were *not* "fine" and there *were* "problems" with Schaben's finances and that this inference raises a jury issue about the truthfulness of Schaben's statements.[9] The court finds such an inference unreasonable. Rumors, suspicions and unproven accusations are not facts. While the loan committee's rebuff of a past informal inquiry about a loan is a fact, it is neither material nor probative of the falsity of Torluemke's statements. The "action" of the loan committee was based, at least in part, on rumor and unproven accusation.[10] Moreover, the committee's "action" must be viewed in light of the uncontroverted evidence that it had approved a loan application by Schaben and that the loan was being handled satisfactorily at the time of Mrs. Sprague's call to Torluemke. Plaintiffs have failed to cite any evidence or authority that Torluemke owed some obligation to volunteer information to essential strangers about rejections of informal (or even formal) inquiries regarding loans or about rumors, suspicions or unproven accusations.

A similar conclusion follows with respect to plaintiffs' contention that the amounts of cash flowing through Schaben's checking account were inconsistent with the capacity of his feedlot and the related contention that a subsequent audit showed that the number of hogs pledged as security for loans to other bank customers exceeded the capacity of Schaben's feedlot. Plaintiffs contend these are facts which should have caused Torluemke to know that things were not "fine" and that there were "problems" with Schaben's finances. However, as previously noted, there is no evidence that the volume of funds flowing through Schaben's account in and before February 1991, was "far in excess of the amount expected for an 8,000 head hog feedlot." But assuming such evidence should exist, there is no evidence that Torluemke knew that it meant things were not "fine" or that there were "problems" with Schaben's finances in February 1991. It is uncontroverted that Schaben's checking account was being maintained in a satisfactory manner. It is also uncontroverted that in February 1991, the bank had no system to monitor or keep an aggregate total of the hogs pledged as collateral by its customers (Uncontroverted Fact 73). Plaintiffs' only response to this uncontroverted fact is a statement that "Torluemke apparently never stopped to consider

8. Defendants argue that Torluemke's statements were mere opinion, not fact, which cannot serve as a basis for fraud. *Timi v. Prescott State Bank,* 220 Kan. 377, 389, 553 P.2d 315 (1976) (Doc. 50, p. 27). For purposes of this motion, the court will treat Torluemke's statements as fact, not opinion.

9. This appears to be a clever attempt to get around plaintiffs' inability to prove the type of relationship between Laurene Sprague and Torluemke which would give rise to a legal or equitable obligation on Torluemke's part to reveal the information upon which plaintiffs rely. *See DuShane, supra,* (223 Kan. at 760, 576 P.2d 674).

10. The committee's action also was based, in part, on Schaben's bankruptcy. The fact of Schaben's bankruptcy obviously was known to Torluemke and he did not tell the Spragues about it. The fact of the bankruptcy does not make Torluemke's statements false because there is no evidence that it was having any negative effect on Schaben's "finances" in February 1991. Since this is not an omission case, no claim can be made that Torluemke committed fraud by omitting mention of the bankruptcy.

the total number of hogs he knew should be at the hog feedlot." (Doc. 57, p. 22). This is tantamount to an admission that Torluemke did not know about Schaben's financial problems in February 1991.

*Metal Trading Services v. Trans–World Services, supra,* is illustrative of the circumstances under which a factual dispute may exist in a case where a plaintiff seeks to recover from a bank for fraudulent or negligent misrepresentations concerning a third party's creditworthiness. In *Metal Trading Services,* the plaintiff twice telephoned Robert Weatherbie, executive vice president of the bank, for financial information about the creditworthiness of Trans–World. Weatherbie responded that Trans–World's business was moving along in a very satisfactory fashion, the bank had experienced no financial problems with Trans–World, the bank had a 6 digit credit with Trans–World, and he did not feel there would be any problem with Trans–World being able to meet their obligations.

Prior to the plaintiff's phone call, the bank had restructured all of Trans–World's outstanding loans and added collateral to all four loans. Around the time the loans were restructured, Trans–World had failed to make installment payment on some of the bank loans. The bank also knew that Trans–World had recently lost its only customer for a major product line.

In light of these facts, the court found that a reasonable fact finder could infer that the statements made by Weatherbie were false and the bank had knowledge of the falsity. 781 F.Supp. at 1544.

The case at bar stands in stark contrast to *Metal Trading Services.* There is *no* evidence that Torluemke and the bank had any awareness of Schaben's financial problems at the time of Torluemke's telephone conversation with Laurene Sprague. On the other hand, there *is* evidence that Torluemke had every reason to believe his statements were true. Schaben's checking account was performing satisfactorily. He was making installment payments on his loan with the bank

in a timely manner. Torluemke himself had hog contracts with Schaben. It simply cannot be inferred that Torluemke had some motive to lie to Mrs. Sprague, a stranger, while possessing knowledge of facts which would place his own investment, as well as the investments of bank customers, at risk.

The court is aware of Judge Saffels' admonition in *Metal Trading, supra* that caution must be exercised in granting a motion for summary judgment where state of mind is an issue. *Id.* at 1543. There are no disputed issues of *material* fact regarding Torluemke's state of mind on February 5, 1991. The court holds that no reasonable jury could find by clear and convincing evidence that Torluemke's statements to Laurene Sprague on February 5, 1991, were untrue and known by Torluemke to be untrue or were recklessly made without regard to their truth. *See Weigand v. Union Nat'l Bank of Wichita,* 227 Kan. 747, 755, 610 P.2d 572 (1980). Defendants are entitled to summary judgment on plaintiffs' fraudulent misrepresentation claim.

### Negligent Misrepresentation

■■ Plaintiffs contend that Torluemke's statements to Laurene Sprague on February 5, 1991, constitute negligent misrepresentation. In order to establish their claim, plaintiffs must prove:

(1) Misrepresentation of a fact;

(2) The misrepresentation was material or significant;

(3) In responding to the credit inquiry Torluemke failed to exercise that degree of diligence and expertise the public is entitled to expect of reasonably competent bank officers;

(4) Plaintiffs reasonably relied upon Torluemke's misrepresentation; and

(5) They suffered damages as a direct and proximate result of such reasonable reliance.

*MSA Tubular Products v. First Bank and Trust Co.,* 869 F.2d 1422, 1424 (10th Cir. 1989).[11]

---

**11.** The elements set out in *MSA* also include omissions. However, as previously stated, plain-

tiffs have limited their claim to negligent misrep-

Plaintiffs' contentions regarding the facts which support the misrepresentation element, for all intents and purposes, are the same as those supporting the misrepresentation element of their fraud claim. It is true, as plaintiffs point out, that negligence cases rarely are decided on summary judgment, particularly when the court must rule on issues of negligence or causation. However, as noted in the case on which plaintiffs rely, *Tersiner v. Union Pacific Railroad Company,* 740 F.Supp. 1519, 1524 (D.Kan.1990) reconsid. granted on other grounds, 743 F.Supp. 1463, even those issues, which correspond to elements (3) and (5), can be decided by summary judgment when all of the evidence upon which a party relies is undisputed and susceptible of only one inference. In this case, the court is not called upon to make a summary judgment decision on elements (3) or (5), *supra.* Its decision concerns element (1). For the reasons set forth with respect to plaintiffs' fraud claim, and with recognition that plaintiffs' burden of proof on its negligent misrepresentation claim is by a preponderance of the evidence, the court nevertheless finds that there are no disputed issues of material fact sufficient to preclude summary judgment on plaintiffs' negligent misrepresentation claim. The court holds as a matter of law that Torluemke's statements to Mrs. Sprague did not constitute a misrepresentation of material fact and that defendants are entitled to summary judgment on plaintiffs' negligent misrepresentation claim.

### Civil Conspiracy

Plaintiffs allege that Torluemke and the bank engaged in a conspiracy with Schaben, to violate the Kansas Securities Act, K.S.A. 17–1252 *et seq.* More specifically, plaintiffs charge that Torluemke and Schaben developed an understanding that Schaben would refer potential investors to Torluemke for reference information, and Torluemke would give them a good reference on Schaben to assist Schaben in selling hog contracts to those prospective investors.

In order to prove their civil conspiracy claim, plaintiffs must show:

(1) Two or more persons;

(2) An object to be accomplished;

(3) A meeting of the minds in the object or course of action;

(4) One or more unlawful overt acts; and

(5) Damages as the proximate result thereof.

Conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy. *Stoldt v. City of Toronto,* 234 Kan. 957, 967, 678 P.2d 153 (1984).

Defendants argue that Schaben's hog contracts do not come within the purview of the Kansas Securities Act. Plaintiffs respond that the hog contracts are an "investment contract" within the meaning of K.S.A. 17–1252(j).

The test to determine whether a particular financial relationship constitutes an "investment contract" is "whether the contractual arrangement involves an investment of money in a common enterprise with profits to come from the efforts of others." *State ex rel. Owens v. Colby,* 231 Kan. 498, 504, 646 P.2d 1071 (1982). Courts have found the existence of an investment contract when the contract involved the purchase and sale of animals, as is present in the case at bar. *Activator Supply Co. v. Wurth,* 239 Kan. 610, 617, 722 P.2d 1081 (1986) (Citations omitted). Defendants attempt to distinguish this case on the basis that the hog contracts contain a "guarantee". Under the hog contracts, plaintiffs were to receive a fixed profit per head of hogs sold. According to the defendants, this provision means plaintiffs were not subjecting themselves to financial loss.

The court is not persuaded by defendants' argument. The "guarantee" was Schaben's word, which turned out to be worthless. The contract provided plaintiffs no security to resort to in case the investment failed to materialize. The court finds the hog contracts were "investment contracts" under K.S.A. 17–1252.

resentation and have not made a negligent omission claim. (Pretrial Order, Doc. 58, p. 7)

Defendants argue that plaintiffs cannot show a meeting of the minds between Torluemke and Schaben. Defendants point to the deposition testimony of Torluemke and Schaben, both of whom deny the existence of any agreement for Torluemke to assist in the sale of Schaben Farms' hog contracts at anytime. (Doc. 50, pp. 31–32)

In response, plaintiffs contend that the existence of an agreement can be shown by "two separate analyses leading to liability by Torluemke and the bank through conspiracy." (Doc. 57, p. 41) Under their first analysis, plaintiffs contend that the object to be accomplished (element (2)) was the sale of hog contracts and the course of action (element (3)) was misrepresentation.[12] They say that the meeting of Schaben's and Torluemke's minds ("tacit understanding") can be *inferred* from the following facts which, in turn, defeat summary judgment based on Schaben's and Torluemke's testimony that they had no "understanding." First, Torluemke agreed to give favorable reference information about Schaben. Second, Schaben referred 95% of his potential investors to Torluemke, and Torluemke gave those investors favorable references. Third, Torluemke continued to give investors favorable information about Schaben, despite the negative information Torluemke possessed about Schaben. Fourth, Torluemke's favorable reference assisted Schaben in selling his hog contracts. Fifth, Torluemke personally benefited from Schaben's success because he owned hog contracts with Schaben. Sixth, the bank benefited because Schaben maintained a large checking account.

Under their second analysis, plaintiffs contend that the jury could infer a tacit understanding between Schaben and Torluemke that Torluemke would provide favorable (but not misrepresented) financial information to potential investors and Schaben, in return, would "continue to favor the bank with his business." Under this "analysis," plaintiffs contend that even if Torluemke did not know that the hog contracts were securities and

therefore that selling them violated Kansas securities laws, a conspiracy nevertheless arose out of Torluemke's and Schaben's "tacit understanding."

The aforesaid facts are not sufficient under either "analysis" to raise the inference of a "tacit understanding" relied on by plaintiffs. Schaben's referral of some or even most of his prospective investors to Torluemke is not evidence of a conspiracy. It is a normal and accepted fact of commercial life. When a prospective investor wants financial information about a business, the first and most logical place to inquire is the bank. Plaintiffs admit that it is not uncommon for banks to be called upon to provide credit references on a daily basis. Schaben did not ask Torluemke for a referral until after he had taken out his first loan from the bank. Since the bank obviously considered Schaben creditworthy enough to loan him the money for a pickup truck and trailer and Schaben had not, and in fact never did, miss a payment on the loan, Torluemke was justified in giving persons who inquired about Schaben a favorable reference. Schaben would have every reason to expect the bank to provide favorable information based upon his track record of making timely loan payments to the bank.

Plaintiffs refer to negative information Torluemke obtained on Schaben as the years passed. Plaintiffs do not specify what this negative information is, but the court assumes they are referring to the three circumstances previously alleged to show Torluemke's statements to Laurene Sprague were fraudulent. The court has previously noted that this negative information was based on speculation and rumor, not fact. The facts before Torluemke were that Schaben was paying off his loan with the bank in a timely fashion.

Plaintiffs note that the bank, Torluemke, and Schaben all stood to benefit from the successful operation of the feedlot. In the court's view, this evidence is too general to create a disputed issue of material fact on

---

12. The court's finding that Torluemke did not make a misrepresentation to Mrs. Sprague is equally applicable here. Plaintiffs did not specifically argue that the facts from which a "tacit understanding" may be inferred likewise support an inference that Torluemke misrepresented Schaben's finances were "fine" and that there were "no problems." If they had, the court still would not find the facts sufficient to raise such an inference.

whether there existed a conspiracy to sell hog contracts in violation of the Kansas Securities Act. Banks and their borrowers have a mutual interest in the success of the borrower's business. Banks loan money with the expectation that it will be repaid with interest. The success of the borrower's business provides him or her with the means to repay the loan. Borrowers, on the other hand, need a bank as a source of capital. This relationship does not render the bank a conspirator when third parties suffer injury at the hands of the borrower.

In this case, the evidence of the relationship between the bank and Schaben is more limited than plaintiffs suggest. Schaben's business did not have a loan at the bank. The bank's loan committee rebuffed Schaben's informal inquiries [13] about the possibility of the bank extending credit to his business. Schaben obtained financing for his business through Producers.

The court finds the evidence concerning the existence of a meeting of the minds in the object to be accomplished is so one-sided that the defendants are entitled to judgment as a matter of law on plaintiffs' civil conspiracy claim. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

### Aiding and Abetting

Plaintiffs argue the defendants aided and abetted Schaben's violations of the Kansas Securities Act. The elements of an aiding and abetting claim are:

(1) The party whom the defendant aids must perform a wrongful act that causes an injury;

(2) The defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; and

(3) The defendant must knowingly and substantially assist the principal violation. *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 936, 811 P.2d 1220 (1991) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983)).

In determining what constitutes "substantial aid", the *Ridenhour* court looked to the

following five factors identified in the Restatement:

> The nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind.

*Id.*, 248 Kan. at 937, 811 P.2d 1220 (quoting Restatement (Second) of Torts § 876, Comment d, p. 317).

Defendants argue that plaintiffs cannot show that Torluemke was either generally aware of Schaben's illegal activity or that he provided substantial assistance. Plaintiffs contend that Torluemke's awareness and substantial aid can be inferred by his actions in providing a favorable reference to prospective investors about Schaben.

Plaintiffs' contention is far too vague and speculative to show Torluemke's awareness of Schaben's illegal activity. Torluemke provided the reference information in the normal course of his business. He received no money from Schaben for the referral information he provided on Schaben. He provided only 5 to 20 references during the years Schaben operated the feedlot. Torluemke had personally invested in the hog contracts and was swindled along with plaintiffs in Schaben's fraudulent activities. It strains credulity to believe Torluemke would aid and abet a fraudulent business, receive no money for his assistance, risk the bank's collateral, and lose his own money in the scheme.

The court holds that plaintiffs have failed to show the existence of disputed material facts sufficient to raise a jury question regarding their burden to prove that Torluemke was generally aware of his role as part of Schaben's fraudulent pyramid scheme or that he provided substantial assistance to the furtherance of the scheme. Defendants are entitled to summary judgment on plaintiffs' aiding and abetting claim.

The defendants' motions (Docs. 49 and 51) for summary judgment are hereby granted.

IT IS SO ORDERED.

---

**13.** Schaben never formally applied for a business loan at the Bank.